In re INVESTIGATION OF WORLD AR-
RANGEMENTS WITH RELATION TO
THE PRODUCTION, TRANSPORTA-
TION, REFINING & DISTRIBUTION OF
PETROLEUM.

No. 19–52.

United States District Court
District of Columbia.

Nov. 10, 1952.

On Motion to Quash Subpoena Duces Tecum

Dec. 15, 1952.

Fowler Hamilton, New York City, Standard-Vacuum Oil Co.

Gerhard A. Gesell, Washington, D. C., John F. Sonnett, New York City, John Cahill, New York City, of Standard Oil Co. of N. J.

George S. Leisure, New York City, Socony Vacuum Co.

Leo T. Kissam, New York City, California-Texas Oil Co.

David T. Searls, Houston, Tex., Lowell Wadmond, New York City, Arabian American Oil Co.

S. A. L. Morgan, Houston, Tex., John J. Wilson, Washington, D. C., of The Texas Co.

Bethuel M. Webster, New York City, Anglo-Iranian Oil Co. Ltd.

Carl E. Newton, New York City, Near East Development Corp.

Leonard J. Emmerglick, Special Asst. to the Atty. Gen., Philip F. Welsh, George H. Schueller, Lavern R. Dilweg, Max Freeman, William H. McManus, William H. Glenn, John Bodley, and Bernard M. Hollander, Washington, D. C., for the United States.

KIRKLAND, District Judge.

A special grand jury has been convened in the District of Columbia to investigate possible violations of Title 15 U.S.C.A. §§ 1–23, Federal Anti-Trust Laws. Voluminous subpoenas duces tecum have been served on various oil companies. The following named companies have filed motions to quash or modify the subpoenas: Standard Oil Company of New Jersey, Socony-Vacuum Oil Company, Standard Oil Company of California, Standard Vacuum Oil Company, Arabian American Oil Company, California Texas Oil Company, Ltd. The Texas Company, Anglo-Iranian Oil Co., Ltd. and Near East Development Corporation.

Previously, by means of a separate motion, the companies sought the discharge of the grand jury because of the presence of a majority of the members who were employed by the United States Government and/or the transfer of the proceedings to another federal jurisdiction on a change of venue and under the provisions of Article 3, of the Constitution of the United States. This court, by a memorandum opinion dated October 8, 1952, denied the motion, 107 F.Supp. 628; the United States Court of Appeals for the District of Columbia affirmed this ruling on October 21, 1952. There is presently lodged with the Supreme Court of the United States a petition for certiorari seeking a further review of the matter.

The remaining motions for the court's consideration are to quash or modify the subpoenas duces tecum and in the latter event to fix a return date. The subpoena is attacked on the general grounds that it is unreasonably burdensome and oppressive; that the subpoena lacks specificity and is too vague; that it calls for the production of documents which are privileged and compliance might violate foreign law; that the subpoena improperly requires the production of documents belonging to subsidiaries and affiliates of the movants; and finally, that the subpoena imperils the American national interests in international affairs. The companies have submitted many affidavits in support of their position.

The Government's position is basically that the subpoena is not unreasonable; that it sufficiently designates the documents; that, if there be any privileged claim, it is not that of the movants, but rather of foreign governments; and that many of the issues now raised are premature and should be asserted at an appropriate time as defenses.

Prior to the hearing of this motion, the Government submitted an addendum modifying the original subpoena duces tecum. The court is of the view that this concession materially limited the Government's demands. As originally issued the subpoena demanded documents back to January 1, 1928. This subjected the movants

to produce papers and records accumulated over a period of 24½ years. The court regarded this as unreasonable and further limited the subpoenas to a coverage extending from January 1, 1941, with a provision permitting the Government to ask for specific documents, correspondence, etc., of an earlier date, if it found they were needed in the investigation. 4th Amendment to the United States Constitution. See also In re Eastman Kodak Co., D.C., 7 F.R.D. 760; In re United States Shoe Machinery Corp., D.C., 7 F.R.D. 756.

Before entertaining the general arguments advanced, the court wishes to make itself understood as being keenly aware of present world conditions. Counsel for the oil companies have spent an appreciative amount of time seeking to impress the court with the importance of this case in the light of world affairs. It has been emphasized by the movants that the oil industry is under severe attack in many countries and its position in these areas is extremely delicate and sensitive. Nor has the Government seriously disputed this. However, the Supreme Court of the United States in Chicago & Southern Air Lines v. Waterman Corp., 1948, 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568, and citing Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385, stated:

> " * * * the very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial instrusion or inquiry." [333 U.S. 103, 68 S.Ct. 436].

See also United States v. Curtiss-Wright Corp., 299 U.S. 304, 319–321, 57 S.Ct. 216, 81 L.Ed. 255; Oetjen v. Central Leather Co., 246 U.S. 297, 312, 38 S.Ct. 309, 62 L.Ed. 726.

No one controverts that there is strife and unrest in the Mid-East where these movants have major business operations under way. These are admitted facts which the court feels it is under a compulsion to recognize. The United States has a present vital interest in the Middle-East and because of this the court will proceed forward in an extremely cautious manner. The courts in the District of Columbia are strategically located at the site of the Nation's Capital. If necessary, the court will not hesitate in future proceedings to seek advice and clarification of the Government's position by calling in government officials capable of advising the court. It must be remembered that the responsibility of the court is to protect not only those appearing before them, but to also protect the American public who have a vital interest in all proceedings.

█ Turning to the remaining arguments the court notes many of the movants rely on Rule 17(c), Federal Rules Criminal Procedure, 18 U.S.C.A. as one of the bases for suppressing or modifying the subpoena duces tecum. It is this court's belief that Rule 17(c), Federal Rules Criminal Procedure is applicable *after* an information or indictment has been returned, and not *prior* to the indictment. However, the point is inconsequential in the light of the 4th Amendment to the Constitution permitting a parallel and equally capable attack on a subpoena duces tecum whether served before or after an indictment.

█ Counsel for the oil companies complain of the "scope" of the subpoena duces tecum. As has been stated repeatedly, the criterion in deciding the validity of a subpoena is that it must be reasonaable and unoppressive. 4th Amendment to the Constitution. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746; Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652; Wheeler v. United

States, 226 U.S. 478, 33 S.Ct. 158, 57 L.Ed. 309; Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652; Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614, 166 A.L.R. 531.

▆▆▆▆ In passing, it is difficult to forego the comment that "reasonableness" is probably one of the most elusive standards a court is called upon to apply. Able counsel differ widely as to what is reasonable and oft times are poles apart where the same factual circumstances exist. Here one side contends that it is entitled to all; the other that it is entitled to nothing. See Bowman Dairy Co. v. United States, 341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 879, for a similar stand by both parties, and also note Judge Yankwich's comments in 10 F. R.D. 165, 168. Generally, both sides are at fault at the outset. As they repeatedly defend their positions, the inevitable stalemate results. It is then that courts are called upon to intervene and to determine what is "reasonable" under the particular facts. See United States v. American Medical Society, D.C., 26 F.Supp. 55, 56. The problem is really acute when millions of documents are involved. In this instance, since serving the subpoena, the Government has modified its position. As previously mentioned the self-imposed limitations have noticeably reduced the scope of the subpoena from its initial sweeping demands. In addition, the court has interposed its ruling as to the "time". Thus, the scope of the subpoena has been decidedly curtailed. It would seem the test of "reasonableness" has been met. A grand jury investigation should be sufficiently broad to allow a full investigation. See Norcross v. United States, 9 Cir., 209 F. 13.

There has been an objection voiced that the documents are not relevant or material. At this stage of the proceedings the relevancy of the documents are tested solely by the purpose of the grand jury in its investigation, namely, "Possible Violation of Title 15, U.S.C. Sec. 1–23"— (Federal Anti-trust Laws).

Another contention raised by the movants centers about the alleged lack of definitiveness and specificity in the subpoena. They state the subpoena is vague and indefinite in that it does not describe the papers demanded, the transactions involved, or the persons, whose papers are sought. However, there is currently pending an investigation of the greatest magnitude, and, quite evidently, must encompass the production of numerous documents. In a number of cases reviewed by Judge Knight in In re Eastman Kodak Company, D.C., 7 F.R.D. 760, 763, there was but a general description of the papers and documents to be produced. The learned Judge, nevertheless, found the case law generally supported the breadth of the subpoenas.

Judge Knight came to this conclusion:

"Designation of each particular paper which is desired is not required, but it must be described with reasonable detail in order to enable the production by the Company directed to produce it. * * * In this particular type of investigation it must be seen that a wider range of ... uiry is necessary than in the general run of criminal cases."

▆▆▆▆ This court is of the view that the papers and documents called for are described with reasonable detail.

Of additional importance is the representation made by the Government that eleven companies, including Gulf, one of the largest oil corporations in the world, with almost identical subpoenas, are presently complying with the Government's demand and have managed to do so without any serious interpretational or operational difficulties. The Government has indicated that it is willing to consider further limitations, concerning files to be searched, at such times as a listing of company officials and an adequate description of company files are made available to it. Mutual cooperation is strongly suggested by the court.

The subpoena calls for the production of documents belonging to subsidiaries and affiliates of the movants. The oil companies

object to this demand and assert their position in one of the companies' many briefs, thusly:

"Control over records, in the sense in which the term is used in subpoena cases, cannot exist unless one has the legal power or right to obtain possession of the records free of the necessity of securing the consent of others."

The Government interprets the same pertinent law as follows:

"The basic problem is whether the parent corporation has such control of the subsidiaries as to be able to produce the documents. It is well established that only such documents are to be produced which are in the possession and/or control of the subpoenaed person."

 When a parent corporation has control over the affairs of the subsidiary and manages the subsidiary primarily for the interest of the parent, the courts will look through the corporate entity. If a corporation is controlled by another and is manipulated by the parent for its own purposes and in its own interests to the prejudice of the public welfare, it is necessary to hold the controlling party responsible. Ballentine on Corporation, Revised Edition (1946) Sec. 136. If one corporation is organized as a mere endeavor to screen the associates in doing a forbidden act, the court can disregard the entity. Northern Securities Co. v. U. S. Case, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679. At this stage of the proceedings the presumption of innocence surrounds all the movants, but there is the inference of possible violation of the anti-trust laws, and whether the movants be possible violators directly or indirectly, through one of their subsidiaries, is an area open for the grand jury to investigate.

 Both sides are in general agreement that the law requires the witnesses to produce documents over which they have control or possession. The mutuality of agreement ceases abruptly when the parties begin to argue to the court what is incorporated in the meaning of the term *"control"*.

The position of the movants is they cannot reach the files of their own subsidiaries unless they are available "free of the necessity of securing the consent of others". It is inescapable that the "others" can only mean the corporations' own subsidiaries. A corporation, be it the parent corporation or the subsidiary corporation, functions under the guidance of its directors. Therefore, if a corporation has power, either directly or indirectly, through another corporation or *series* of corporations, to elect a majority of the directors of another corporation, such corporation may be deemed a parent corporation and in control of the corporation whose directors it has the power to elect to office. If any corporation herein under the subpoena duces tecum has that power it has the control necessary to secure the documents demanded by the Government. Furthermore, in light of the reasoning of United States v. Fleischman, 339 U.S. 349, 70 S.Ct. 739, 94 L.Ed. 906, if any of the present movants jointly have the control described above they have sufficient control to produce the documents requested.

The court has considered the view of the cases cited by the movants and especially Munroe v. United States, 1 Cir., 216 F. 107, L.R.A.1915B, 980, but feels itself constrained to adopt the conclusion set forth above.

Again, the movants seek to quash or modify the subpoena further because it allegedly calls for matter which they claim is privileged. Specifically, the privilege they cite relates to confidential information passing between the movants and a foreign sovereign.

 Privilege is an exception to the general rule that the public has a right to every man's evidence. United States v. Bryan, 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884, citing Wigmore, Evidence (3rd Ed.) Section 2192. In some instances a special privilege may be inapplicable in criminal cases. D.C.Code 1951, § 14-308. The privilege is one that must be exercised by the party entitled to assert it.

■ By the tenor of the movants' own argument they admit the privilege belongs solely to the foreign sovereign. Accordingly, the privilege is one that must be asserted by the foreign sovereign and it cannot be claimed by a party for his own benefit, particularly so when the party is not a national of the sovereign involved. Wharton's Criminal Evidence 11th Edition, Section 1214; Wigmore, 3rd Edition, Sections 2286 and 2378 (g) (5). Where this country possesses such a privilege the sole party having the power to exercise that privilege is a qualified representative of the United States Government. Firth Sterling Steel Co. v. Bethlehem Steel Co., D.C., 199 F. 353. This court may desire official pronouncement of the claim of privilege by a competent official of the foreign sovereign affected before it will give recognition to the plea. Foreign Governments have Embassies located within the District of Columbia and this court is available if any Government wishes to exercise its privilege. By no means is it to be understood this court will sustain the claim. That decision will be postponed until the issue has been appropriately raised.

■ Many documents called for are in foreign countries. Much argument is made to quash the subpoena in so far as it calls for papers that are within the territorial jurisdiction of foreign governments, who prohibit the removal of these papers. Numerous legal opinions, by way of affidavits, have been filed expressing the possible penalties the movants may face if they comply with the subpoena. Calling for the disclosure of documents is a procedural matter and it has long been the rule that the "lex fori" governs the law of procedure. However, substantive law may be affected in one jurisdiction when procedural law operates in another, and this court does not particularly desire to promulgate a "procedural" order imposing serious criminal penalties under foreign substantive law.

Here, again, we may be able to circumvent any harsh consequences. This court will reserve its view on the above matter pending the movants showing:

(a) That in good faith they have endeavored to gain from the foreign sovereigns consent to remove the required documents or copies and have been refused the necessary permission. The purpose here is to establish that there is a true objection by the foreign sovereign, and not a premature expectation by the movant party.

(b) What, if any, interest the foreign sovereign has in the movant corporation or in the investigation. This probe is made to determine whether or not the foreign sovereign is engaged in commerce affecting the United States. This court recognizes that a national government is immune from suit in the court of another nation, but the modern phenomenon of government engaged in business has properly led to a tendency to restrict foreign immunity. Cf. Coale v. Societe Cooperative Suisse Des Charbons, Basle, D.C., 21 F. 2d 180 and other cases cited in 42 Harvard Law Review 1078. The court seeks to be better informed as to the relationship the foreign sovereign may have with the industry.

(c) Proof of the foreign law by the opinion of experts or by other proper evidence. This is the preferred approach to the proof of law of a foreign jurisdiction; See Hanley v. Donoghue, 116 U.S. 1, 6 S. Ct. 242, 29 L.Ed. 535; Restatement Conflict of Laws, Sec. 621. Affidavits are not necessarily sufficient. The court may desire advice on the interpretations of pertinent foreign law.

The movants are advised they must proceed on this particular point by December 8, 1952, otherwise the court will assume they are able to comply without difficulty.

Turning to a new matter, the court directs the Government's attention to an additional approach where the movants are faced with such difficult barriers, in attempting compliance, as violation of foreign laws or lack of mechanical means to reproduce the many documents sought. This court is prepared to grant an order permitting the inspection, by the Govern-

ment, of the movants' available documents located in foreign offices. The order should state the time and place, and require the movants to furnish the Government with copies of any specified documents which may be requested as a result of the inspection. See Securities and Exchange Commission v. Minas De Artemisa, 9 Cir., 150 F.2d 215 for a like order.

There remain a number of specific objections. The first is the subpoena calls for millions of items and the grand jury will be unable to read them all. The answer to this objection is that the documents of relative importance will be few in number. Secondly, several of the movants argue the subpoena calls for documents having to do with activities which do not affect the interstate or foreign commerce of the United States and for this reason it lies beyond the scope of the Sherman Act. This is in the nature of a defense to an indictment and as such is premature.

This investigation will, undoubtedly, cause great inconvenience to the movants. Inconvenience is relative to size. In the matter of Radio Corp. of America, D.C., 167 F.R.D. 13. But the laws, which have helped protect the movants as they grew in size, are also designed to permit an investigation of them, if the proper authorities are of the impression circumstances so warrant it.

In accordance with this memorandum, it is by the court, this *10th* day of November, 1952,

Ordered, that the motion to quash the subpoena duces tecum is denied, but it is to be modified in the following respects:

Paragraph 1. This paragraph is modified so that the period of time shall commence as of January 1, 1941. The Government has also imposed limitations as follows:

"As to documents physically located abroad, and of which a copy is in the United States, only the copy need be supplied. If no copy is in the United States the subpoena shall apply only to those documents located in the principal office or offices of the parent corporation under subpoena maintained by it in each foreign country, and in the principal office maintained in each foreign country by or for any subsidiary or affiliated corporation. No document need be produced as to which there is not now in existence an English translation".

(a) This subsection has been modified by the Government so as to limit the "exploration or working" category to cover only contracts and agreements concerning the joint exploration or working by the corporation under subpoena and any other domestic or foreign petroleum corporation of crude oil deposits outside of the United States.

(b) This subsection has been limited by the Government to purchase, sale or exchange of crude oil, in excess of one million barrels.

(c) This subsection is to remain unchanged.

(d) This subsection has been limited by the Government "to purchase, sale or exchange of petroleum products having been or to be manufactured outside of the United States 'in excess of one million barrels' or exported from the United States".

(e) This subsection is to remain unchanged.

(f) This subsection has been limited by the Government so that it does not call for contracts and agreements not relating exclusively to foreign rights under patents and processes.

(g) The word "refining" has been stricken.

(h) This subsection has been limited by the Government so as not to include documents in the nature of housekeeping documents such as invoices, bills of sale, bills of lading, and routine individual sales.

Paragraph 2. This paragraph is also modified so that the period of time shall commence as of January 1, 1941. The Government, in addition has stricken the words "and agents", and has applied the same limitation as shown in paragraph 1, to wit:

"As to documents physically located abroad, and of which a copy is in the United States, only the copy need be supplied. If no copy is in the United States the subpoena shall apply only to those documents located in the principal office or offices of the parent corporation under subpoena maintained by it in each foreign country, and in the principal office maintained in each foreign country by or for any subsidiary or affiliated corporation. No document need be produced as to which there is not now in existence an English translation".

(a) This subsection has been limited by the Government so as to read, "Negotiations for, the execution of, the operation at the executive level of, and the interpretation of any and all of the contracts or agreements (including letter agreements, letters of intention and heads of agreements) referred to in the preceding Paragraph 1.

(b) The words "but not limited to" are surplusage and therefore are stricken.

(c) This subsection has been modified so as to read "Changes in price structure for international oil trade".

(d) This subsection is to remain unchanged.

(e) This subsection is to remain unchanged.

Paragraph 3. This paragraph is modified so that the period of time shall commence as of January 1, 1941.

Further Ordered, that the date required to make any return to said subpoena duces tecum be and the same is hereby adjourned until January 12, 1953, and

Further Ordered, all other matters not heretofore expressly ruled upon are overruled.

On Motion to Quash Subpoena Duces Tecum.

The United States Government, through the Department of Justice, has commenced an investigation of alleged world wide arrangements, by twenty-one oil companies, to determine if there is a possible violation of the Sherman Anti-Trust Laws. A broad subpoena duces tecum served on the companies and calling for millions of documents, located in the United States and abroad, has been challenged. Previously, rather than quash the subpoena *in toto*, this court in a memorandum opinion modified the demand for documents in several respects. In its decision, this court also reserved its views as to the production, or inspection of papers located in foreign jurisdictions and/or subject to foreign laws, pending the movants showing:

(a) A good faith endeavor to gain consent from the foreign sovereign to remove the required documents;

(b) What, if any, interest the foreign sovereign has in the movant corporation, or in the investigation; and

(c) Proof of the foreign law.

The court advised the movants that they were to proceed on this point by December 8, 1952, otherwise the court would assume they were able to comply without difficulty. By the end of the day, on that date, six companies, viz., Standard Oil Company of New Jersey, Anglo-Iranian Oil Company, Ltd., The Texas Company, Standard Oil Company of California, Standard Vacuum Oil Company, Socony Vacuum Oil Company, Inc., had filed notice of their inability to produce the documents, or copies, located in foreign countries. This was the posture of the case prior to the present hearings.

The court is now prepared to make findings of fact and conclusions of law on the motion by Anglo-Iranian Oil Company, Ltd.

Anglo-Iranian Oil Company, Ltd., is a British Company, whose headquarters are located in London. It has offices in other parts of the world, including an office at 610 Fifth Avenue, New York City, New York, where the present subpoena *duces tecum* was served. A general appearance was entered by counsel for that company.

Although the British Government has a capital investment of approximately 35% of the total capital, it dominates the ownership of the "ordinary shares" which carry

with them the greater portion of voting rights and thus controls the company.

Counsel for the company have presented several arguments in support of its position. However, this court need only make reference to one.

In the course of argument, specifically on November 7, 1952, counsel for the company read a letter in open court, dated October 9, 1952, addressed to the Company's Directors and allegedly from Honorable Geoffrey Lloyd, Great Britain's Minister of Fuel and Power. The letter was in the form of a directive and in pointed terms ordered the company officials "not to produce any documents which were not in the United States of America and which do not relate to business in the United States, without in either case, the authority of Her Majesty's Government".

Initially, this court voiced concern with the authenticity of the particular document, in that representations by foreign sovereigns are best accepted for local court proceedings when presented either through the executive branch devoted to our international relationships, or by direct presentation to the court from a duly qualified representative of the foreign power. The state of the document was further put in issue when the Special Assistant to the Attorney General contended that the directive to the officers of the Anglo-Iranian Oil Company was not an act of the British Government.

The diversity of views prompted this court to write a letter dated November 26, 1952, to the Secretary of State asking:

"* * * that it be advised, in writing, and through the proper diplomatic channels, if these documents are properly authenticated, embrace a claim of sovereignty and have the official approval of Her Britannic Majesty's Government".

On December 5, 1952, the Department of State, through an official of their legal branch, delivered to the court a note from the Honorable Anthony Eden, which reads as follows:

Foreign Office
S. W. 1.

"I, the Right Honourable Anthony Eden, Member of Parliament, Her Majesty's Principal Secretary of State for Foreign Affairs hereby certify that the letter dated 2nd October and addressed to the Anglo-Iranian Oil Company was signed by the Right Honourable Geoffrey Lloyd, Member of Parliament, in his capacity as Minister of Fuel and Power in Her Majesty's Government in the United Kingdom, and was issued with the official approval and under the full authority of Her Majesty's Government in the United Kingdom. This letter from the Minister of Fuel and Power embraced a claim of sovereignty in that it was addressed to British subjects and organisations by Her Majesty's Government in the exercise of their Governmental authority and in the British public interest, including the economic, strategic and political interests of Her Majesty's Government.

(signed) Anthony Eden

29th November, 1952"

Also filed in the cause and properly certified under Title 18, Section 3494 and Title 28, Section 1741 of the United States Code are foreign documents signifying Great Britain's interest and relationship with the Anglo-Iranian Oil Company.

Courts take judicial notice of the sovereign character of a party and in case of doubt address their own inquiries to the executive. Republic of China v. Pang-Tsu Mow, D.C., 1951, 101 F.Supp. 646. A foreign sovereign is immune from suit, without its consent, in courts of the United States. The Exchange v. M'Faddon, 7 Cranch. 116, 3 L.Ed. 287; L'Invincible, 1 Wheat. 238, 4 L.Ed. 80; Ex parte Muir, 254 U.S. 522, 41 S.Ct. 185, 65 L.Ed. 383; Hannes v. Kingdom of Roumania Monopolies Institute, 169 Misc. 544, 6 N.Y.S.2d 960 and 260 App.Div. 189, 20 N.Y.2d 825; Republic of Mexico v. Hoffman, 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729.

The foreign government may adopt the procedure of asking the State Department to allow immunity or they may also present their claim of immunity by appearance in the matter. Republic of Mexico v. Hoffman, supra. Both English and American Courts have held that a sovereign need not affirmatively assert this immunity. Cardashian v. Snyder, 57 Washington Law Reporter (1929) 738; Mighell v. Sultan of Johore, (1894) 1 G.B. 149; Nankivel v. Omsk All Russian Government, 237 N.Y. 150, 142 N.E. 569; Mason v. Inter-colonial Ry. of Canada, 197 Mass. 349, 83 N.E. 876, 16 L.R.A.,N.S., 276; Puente v. Spanish National State, 2 Cir., 1940, 116 F.2d 43. Foreign governments have been held immune from suits even though they had never been recognized by the Government of the United States. Wulfsohn v. Russian Socialist Federated Soviet Republic, 234 N.Y. 372; 138 N.E. 24; Nankivel v. Omsk All Russian Government, supra. Where the political branch of the government declines to assert an opinion as to the status of a foreign sovereign, involved in a legal proceeding, the courts may decide for themselves whether all the requisites of immunity exist. Republic of Mexico v. Hoffman, supra.

The first issue is whether the corporate entity involved in the Anglo-Iranian Oil Company is of such a character as to be recognized as a unit of the British Government. Under the circumstances at hand this would also require an observation to be made to the relationship existing between the corporate-agent and the Foreign Sovereign's governmental functions and duties.

In determining whether or not a given corporation is an instrumentality of its government it is not material whether the government owns all the stock, Smith v. Kansas City Title & Trust Co., 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577; none of the stock, Farmers' & Mechanics' Sav. Bank of Minneapolis v. State of Minnesota, 232 U.S. 516, 34 S.Ct. 354, 58 L.Ed. 706, or only a part of the stock, McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed.

579; Osborn v. Bank, 9 Wheat. 738, 6 L. Ed. 204. The British Government, although having only slightly better than one-third of the capital investment of Anglo-Iranian, controls the corporation by reason of its ownership of the greater portion of the voting stock. However, of far more potency is the object and purpose of the corporation. Anglo-Iranian came into being as the result of an agreement between Anglo-Persian Oil Company, Ltd., and the British Government in the year 1914. The latter acquired its interest in this company to insure a proper supply of petroleum, crude oil and other products for the British Fleet. In the agreement drawn up with the Anglo-Persian Oil Company there appears the following clause:

"Paragraph 13. A large consumer like the Admiralty, with the national interest of naval defense in its keeping, cannot, however place itself in a position of dependence for vital supplies upon a few large companies whose interests are necessarily cosmopolitan and financial, * * *. It is important and essential in naval interests to secure that at least one large British Oil Company shall be maintained, having independent control of considerable supplies of natural petroleum, and bound to the Government by financial and contractual obligations * * *".

Britain's Navy, in past wars, has proved itself to be one of the island-kingdom's main bulwarks of defense against aggression. The supplying of oil to insure the maintenance and operation of a naval force—and in this day and age, an air force—is certainly a fundamental government function serving a public purpose. See Berizzi Bros. v. The Pesaro, 1926, 271 U.S. 562, 46 S.Ct. 611, 70 L.Ed. 1088.

This court notes that one of Great Britain's contentions before the International Court of Justice in 1951, with regard the Iranian Oil disputes, was that the to agreement of 1933 between the Iran and the Anglo-Iranian Oil Company was in effect a treaty or convention between *two*

*sovereign states* and therefore the International Court of Justice did have jurisdiction over the controversy. (underlining supplied)

This court is of the impression that the corporation, Anglo-Iranian Oil Company, is indistinguishable from the Government of Great Britain. Dexter & Carpenter v. Kunglig Jarnvagsstyrelsen, 2 Cir., 1930, 43 F.2d 705 (Since the corporation and the Government of Sweden are one and the same, immunity should be granted); Bradford v. Dir. Gen. of Railroads of Mexico, Tex.Civ.App., 1925, 278 S.W. 251. (Since the railroad is operated by agency of government, suit is against the state itself); Mason v. Inter-colonial Ry. of Canada, 1908, 197 Mass. 349, 83 N. E. 876, 16 L.R.A.,N.S., 276 (Suit is virtually against the sovereign of a foreign country); and United States of Mexico v. Schumck, 1944, 293 N.Y. 264, 56 N.E.2d 577, 56 N.E.(2) 577, (the court allowed a Mexican corporation, operating an expropriated oil field, to exercise the right of a friendly sovereign and held it was "immune" from suit in the United States).

To cite a foreign sovereign into an American Court for any complaint against him in his public capacity is contrary to the law of nations. DeHaber v. Queen of Portugal, 17 Q.B. 171. All the reasons for immunity which are the basis of the doctrine in international law as incorporated into our law exist herein. There is the same necessity for reciprocal rights of immunity, the same feelings of injured pride if jurisdiction is sought to be exercised, the same risk of belligerent action if government property is subsequently seized or injured. Government of the Republic of Spain and S. S. "Arant zazu Mendi", (1939) App.Cases (England) 256, 265.

The consequences of a successful prosecution of Anglo-Iranian here would in reality be to charge and find the British Government guilty of violating a law of the United States, which imposes criminal penalties.

This court has compared United States v. Deutsches Kalisvndikat Gesellschaft, D.C., 31 F.2d 199 where it was held a suit by the United States Government to enjoin violations of antitrust laws was maintainable against a corporation organized under general corporation law of France and in which France owned eleven-fifteenths of the capital stock. However, the French Government was involved in a commercial venture, entirely divorced from any governmental function. There is a vast distinction between a seafaring island-nation maintaining a constant supply of maritime fuel and a government seeking additional revenue in the American markets and causing a direct injury in the United States to our domestic commercial structure.

The English Government has expressed its position in this matter in a note signed by the Honorable Anthony Eden, Her Majesty's principal Secretary of State for Foreign Affairs, and in a letter signed by the Honorable Geoffrey Lloyd, Minister of Fuel and Power, which passed through the State Department without comment or instructions; the purport of both writings is a clear and positive indication that Great Britain is seeking full protection of her interests; embraces a claim of sovereignty and asserts her privilege of immunity. The significance is unmistakable. In argument both sides have agreed that the interpretation of the correspondence is a judicial function and does not depend for finality upon advice or interpretation from the executive. Accordingly, sovereign immunity is extended to Anglo-Iranian and the subpoena served upon this company is quashed.

Counsel will prepare an appropriate order.