**NATIONAL BOND FINANCE COM-
PANY, Plaintiff,**

v.

**GENERAL MOTORS CORPORATION,
Defendant.**

No. 12288-3.

United States District Court
W. D. Missouri, W. D.

April 20, 1964.

Knipmeyer, McCann & Millett, Kansas City, Mo., for plaintiff.

Tucker, Murphy, Wilson, Lane & Kelly, Kansas City, Mo., for defendant.

DUNCAN, District Judge.

Plaintiff, a Missouri corporation, with its principal place of business in Kansas City, instituted this suit against the defendant, a foreign corporation, for actual and punitive damages growing out of transactions between the plaintiff and the Lincoln Park Buick Company, doing business in Chicago, Illinois, involving the purchase of conditional sales contracts for the sale of motor vehicles.

Plaintiff contends that the Lincoln Park Buick Company was the "alter ego" of the General Motors Corporation, and that the latter was responsible for the former's obligations.

Motors Holding Division is a branch of the General Motors Corporation, and is engaged in the financing and promotion of sales agencies for the sale of General Motors products.

Its general plan of operation is to finance dealers, or individuals who desire to become dealers, in the sale of General Motors products, and to carry out its object, ordinarily a corporation is formed by General Motors Corporation through its Motor Holding Division, and General Motors contributes a specified sum to the capital stock of such corporation, and is issued Class A stock in the amount of its contribution to the capital structure.

The individual or individuals who are to operate the agency contribute a designated sum and receive therefor Class B stock in the amount of their contribution to the capital stock. The Class A stock held by General Motors is the exclusive voting stock, Class B having no voting rights in the corporation.

The usual setup of the organization is that two employees of General Motors Corporation Motors Holding Division become directors of the company; the person for whom it is organized becomes a member of the Board of Directors and is elected president, and he thereafter becomes the chief administrative officer of the new company. The only means by which the individual investor can gain control of such a dealership is through the purchase, under the Motors Holding Investment Plan, of the Class A stock owned by General Motors. This could be accomplished only as follows:

In any year in which the net profits of the dealership exceed 15% of net investment (including General Motor's note), the individual dealer is entitled to a bonus of 33⅓% of all profits above that 15%. The individual also receives his pro rata share of dividends—including the first 15% of profits. The individual

is required by contract with General Motors to apply *all* of his dividends and at least 50% of his bonus toward the purchase of General Motors' Class A stock.

As the individual purchases the Class A stock, it is automatically converted to Class B, until all of the Class A stock is purchased, at which time the individual becomes the sole owner of the business.

There is further provision that all of the voting stock cannot be purchased from General Motors until the loan it has made to the dealership is repaid. As long as General Motors owns a single share of stock in the dealership, it controls the voting.

It should also be noted that in reference to losses, the first 15% of capital loss is borne by the individual dealer and General Motors ratably; above 15%, losses are borne by the individual alone, up to the amount of his capital investment.

In 1951 the Lincoln Park Buick was organized by the Motors Holding Division of General Motors, under the laws of the State of Delaware, and qualified to do business in the State of Illinois.

The Lincoln Park Buick Company was capitalized in the sum of $300,000.00, which consisted of 1200 Class A voting shares having a par value of $100.00 each, and 600 shares of Class B, having a par value of $100.00 each, and a long term note of $120,000.00.

In line with the Motors Holding Division dealers' investment plan, the Motors Holding Division subscribed for and became the owner of 1200 shares of Class A stock. Through further investment, it became the owner and holder of Lincoln Park Buick Company's long term note for $120,000.00.

Mr. Charles E. Holzkamp, the individual investor and operator, purchased and became the owner of the 600 shares of Class B stock. Holzkamp was elected to the Board of Directors at its first meeting and immediately thereafter was elected President. Two of General Motors employees connected with the Motors Holding Division were elected as the other two directors of the company. The company continued to operate from 1951 under this setup until 1956.

The only business Lincoln Park Buick Company had with the defendant General Motors Corporation was the purchase at wholesale of Buick automobiles and replacement parts which it sold as an independent retailer, and in connection with its used car business and repair work.

On January 23, 1956, Holzkamp resigned as director and President of Lincoln Park Buick Company, and defendant's Motors Holding Division purchased from Holzkamp all of the Class B shares of stock of the company, and one of its employees was elected to the Board of Directors and became President of the company.

On or about June 22, 1956, a reorganization of the capital structure of Lincoln Park Buick Company was effected by its Board of Directors. Additional amounts of money in the sum of $66,693.64 were invested in Lincoln Park Buick Company by Motors Holding Division.

Following this reorganization, the total amount invested in Lincoln Park Buick Company was $200,000.00 consisting of 768 shares of Class A stock having a par value of $100.00 each, and 465 shares of Class B having a par value of $100.00 each, and a long term note of $76,700.00 payable to defendant's Motors Holding Division.

Mr. Don Ross of Kansas City, who had long been engaged in the motor business and had been sales manager for Sam Schwartz Pontiac Company at Kansas City, was interested in obtaining a dealer's franchise for the sale of General Motors products, and was interested in becoming an investor in Lincoln Park Buick Company stock.

During the interim between the resignation of Holzkamp as director and President, and the completion of the reorganization of the capital structure, Don Ross was employed as Lincoln Park Buick Company's general manager. He acted in this capacity for approximately

two months, then purchased all 465 shares of Class B stock from defendant's Motors Holding Division. He was immediately elected to the Board of Directors, and by the Board of Directors was elected President, and immediately assumed full control of the administrative direction of the Lincoln Park Buick Company.

At the time of the reorganization, it was thought that the nature of the business required less capital stock than at the time of its incorporation. It was considered by the Motors Holding Division as an investor, that $200,000.00 was sufficient for the conduct of the Lincoln Park Buick Company business as a franchise Buick dealer and for it to meet a profitable discharge of its responsibilities.

The Board of Directors of Lincoln Park Buick Company by proper resolutions, appointed certain bank depositories for the corporate funds of said company, and designated certain officers and employees to sign checks, drafts, notes, acceptances and other documents, and otherwise to engage in the usual business transactions with such depositories on behalf of Lincoln Park Buick Company.

The Board of Directors also authorized the President to arrange for independent auditing tax service, insurance and legal counsel for Lincoln Park Buick Company, and the President did subsequently arrange for such services.

The Directors also authorized Lincoln Park Buick Company's officers and employees to engage in the discounting and sale of finance paper at wholesale and retail with certain banks and finance companies (not including the plaintiff), and to execute in connection therewith certain assignments and guarantees on behalf of Lincoln Park Buick Company.

Mr. Ross personally supervised all of the hiring and firing of Lincoln Park Buick employees; he employed independent legal counsel and accountants of his own choosing to represent Lincoln Park Buick. He also selected certain depositories for the funds of the company as well as for wholesale financing services.

He also authorized and empowered specified officers and employees of the company to execute financing agreements as a means of effecting the usual business transactions on behalf of Lincoln Park Buick Company. Mr. Ross caused said authorizations to be certified and filed with those banks and finance companies in Chicago, Illinois, with which Lincoln Park Buick Company was then doing business, particularly the Exchange National Bank in Chicago and Associates Discount Corporation, also of Chicago.

In connection with the purchase of conditional sales contracts by the Exchange National Bank of Chicago, Ross also executed a guarantee signed by himself and his wife in the sum of $50,000.-00 protecting the bank against loss by virtue of purchase of Lincoln Park Buick conditional sales contracts.

Apparently at the time Ross took over the management of the company, its time sales agreements were for a period from 24 to 30 months, and the company was not able to sell or discount the contracts for monthly payments for a longer period of time in the Chicago area.

National Bond Finance Company of Kansas City, Missouri, was a family owned corporation consisting of Thomas Higgins, Sr., and Thomas Higgins, Jr., and the immediate members of their families. During Ross' association with Sam Schwartz Pontiac in Kansas City, he had had some business connections with both Higgins, Sr., and Higgins, Jr. He came to Kansas City some time in 1956 and discussed with Higgins, Sr., the possibility of National Bond Finance purchasing a substantial number of conditional sales contracts on a 36 month payment basis.

The arrangement was not immediately formulated, but shortly after Ross' trip to Kansas City, Thomas Higgins, Sr., at the request of Ross, went to Chicago where they entered into an agreement by

which the Higgins company would purchase 12 or 15 of the conditional sales contracts, a month. Such purchases were to be guaranteed by the Lincoln Park Buick Company and the finance company's lien protected.

The Board of Directors of Lincoln Park Buick Company did not authorize Ross to enter into this agreement or understanding, but the evidence clearly reveals that subsequent to its execution, at least the other two directors of the company had full knowledge of such arrangement.

There had been other business dealings between Ross and Higgins, one of which was that Ross had borrowed $6,000.00 from the National Bond Finance and had given as security, a note signed by the Sam Schwartz Company of Kansas City, Missouri. Following this arrangement, the plaintiff began to purchase conditional sales contracts and progressed with satisfactory results until some time in 1957.

The Lincoln Park Buick Company had sold a quantity of Buick automobiles to Vacation Convertibles, Inc., of Indianapolis, Indiana, engaged in the car rental business. The plaintiff became the purchaser of the conditional sales contracts representing these sales on a recourse basis. The first purchases were handled with reasonable satisfaction, but on the last group of 15, (out of which the present controversy arose), Vacation Convertibles, Inc., failed to meet its obligation, and plaintiff began to receive insufficient fund checks.

Upon investigation in Indianapolis, it was discovered that while the conditional sales contracts had been recorded, the lien of the plaintiff had not been recorded. Apparently this last group of cars was sold by the Lincoln Park Buick Company without having recorded any of the plaintiff's liens in accordance with the agreement between the plaintiff and Ross. Those cars had been disposed of by Vacation Convertibles, Inc., and the plaintiff was unable to obtain possession of them or to collect the payments due on them.

No certificates of title were ever issued by the State of Indiana that reflected the lien of the plaintiff National Bond Finance Company on any of the automobiles described in the fifteen conditional sales contracts in question. Each of the fifteen sales were executed on behalf of Lincoln Park Buick Company as the conditional sales vendor by Don Ross as President, with but one exception, and that document was executed on behalf of the Lincoln Park Buick Company by Wilma Pasley, office manager and later treasurer for a short time, of the company. She had been brought into the organization from Kansas City by Ross.

Each of the conditional sales contracts carried an assignment and guaranty running in favor of the plaintiff and executed by Ross as President. Each of the said fifteen conditional sales contracts provided for eleven monthly payments and a twelfth larger amount at the conclusion of the twelve month period.

Plaintiff first discovered the condition of its contracts in 1958, when payments became in default. On September 9, 1957, because of losses incurred during Ross' operation, Ross resigned as a director and President of the company, and Mr. C. E. Talmage, who was then the division manager of the Motors Holding Division of defendant, was elected as a director and as President of Lincoln Park Buick Company, and together with the other two directors, who were likewise members of the General Motors organization, proceeded to liquidate the business. The liquidation continued from 1958 to 1961, when it was finally concluded.

Following the discovery in 1958 of the fact that its liens were not properly recorded, the plaintiff, through Higgins, Sr., communicated with the new president of Lincoln Park Buick Company and made demand for payment. By that time there was no money. He also made demand upon General Motors Corporation both in Chicago and Detroit and liability was denied by that company for the obligations of Lincoln Park Buick Company.

The obligations of the Lincoln Park Buick Company were paid out of money derived from the sale of its assets, with three exceptions.

The Exchange National Bank of Chicago was paid out of the liquidation of Lincoln Park Buick Company assets in the sum of $32,000.00, and Associates Discount Company received payments from Lincoln Park Buick aggregating upwards of $250,000.00.

In April, 1958, General Motors Corporation made a voluntary payment of $32,366.98 to the Exchange National Bank in payment of the deficiency then due and owing to the bank from the Lincoln Park Buick Company. This relieved Ross of any obligation under the guarantee signed by him and his wife.

In March, 1958, the General Motors Corporation also made voluntary payment to Associates Discount Corporation in the sum of $50,988.98 to satisfy the amount of the deficiency then due and owing by the Lincoln Park Buick Company.

In April, 1958, General Motors Corporation also made a voluntary payment to White Way Electric Sign and Maintenance Company in the amount of $1,960.00 in satisfaction of an indebtedness due from Lincoln Park Buick Company to it.

During the period of liquidation, there were numerous discussions and meetings between Higgins and the liquidators and some of the cars were reclaimed under the conditional sales contracts, and some of them were brought to Kansas City by the plaintiff for disposition.

Finally, at the close of the liquidation, the corporation having no further assets, it was dissolved.

The two General Motors employee-directors kept in close touch with the business operation of the company; the meetings of the Board were attended by them, the minutes were usually written by a representative of the General Motors Corporation, but other than being employees of General Motors Corporation, they exercised no more control or supervision directing the affairs of the Lincoln Park Buick Company than might be expected of diligent employees or a Board of Directors.

It is plaintiff's contention that the General Motors Corporation, in view of its knowledge of the transactions and its acceptance of the fruits of the improper conduct on the part of Ross as President of Lincoln Park Buick Company, and its failure to preserve the lien of the plaintiff on the conditional sales contracts, renders it not only liable for the principal amount, but that it was guilty of bad faith and is liable for punitive damages.

Judge Ridge, before whom this trial was originally pending, in his Memorandum and Order of June 3, 1960, concerning plaintiff's motion to produce, ruled that the plaintiff's complaint was insufficient to state a claim for fraud under Rule 9(b), F.R.Civ.P.

Even if fraud was sufficiently pleaded in this case, however, it is certain that the plaintiff has not borne the burden of proving it. The only evidence directly bearing on this matter is the testimony of Don Ross (pages 87–88 of his deposition) which was read into evidence. He denied participation in, or knowledge of, any fraud, and this testimony was uncontroverted.

The question of constructive fraud has never been brought up in the case, but it is a general rule that an essential element of any fraud is a material misrepresentation of fact. An unfulfilled promise to do something in the future cannot be taken as a material misrepresentation of fact without further proof showing fraudulent intent or other special circumstances. The obvious reason for this is, that to hold otherwise would make every breach of contract a fraud. See 37 C.J.S. Fraud §§ 1, 2 and 11.

The plaintiff having wholly failed to prove fraud of any nature in this case, the ruling on this point must be for the defendant.

Thus, we may proceed to a determination of the issues without consideration of that question, and be confined strictly to the question of liability of General Motors Corporation for the amount of plaintiff's loss.

The evidence does not reveal that the plaintiff or its officers ever made any demand for the certificates of title to the automobiles upon which it had lent money. It seemed to be entirely content with the guarantee of the Lincoln Park Buick Company, and gave no attention to what happened to the paper after the sale was made, so long as the monthly payments were regularly forthcoming.

The particular facts which are pertinent to the controversy reveal: that

(1) General Motors controlled all voting stock in Lincoln Park Buick Company, and thus the control of the company was in its hands. The only manner in which the investor could gain control or any voice in the management through the Board of Directors was by means of the bonus system described, supra.

(2) The Board of Directors of Lincoln Park Buick Company was controlled by General Motors Corporation from the founding of the company to its liquidation. The two employees on the Board, aside from the investor, were always employees of General Motors Motors Holding Division.

(3) General Motors Corporation through its Motors Holding Division provided the initial capital by means of unsecured loans and the purchase of Class A voting stock of Lincoln Park Buick Company.

(4) All accounting procedures used by the dealership were General Motors Corporation procedures. The books of the dealership were checked by a General Motors Corporation employee and reports made to General Motors Corporation concerning the handling of the accounting.

(5) General Motors Corporation supervised the liquidation of Lincoln Park Buick Company, and paid three creditors, Exchange National Bank, Associates Discount and White Way Sign Co. The amounts involved in these three transactions aggregated more than $80,000.00, and came out of General Motors Corporation funds.

It appears from the exhibits and the testimony of the employees of these three creditors that they considered General Motors Corporation responsible for Linclon Park Buick Company's debts and expected the payment which they received.

(6) Don Ross attended few of the directors' meetings, because, as he claimed, they were controlled by General Motors Corporation directors. He had no connection with the preparation of the minutes, and they were usually sent to him for signature. He signed them as a matter of course.

(7) The minutes of the Board of Directors meetings of Lincoln Park Buick Company indicate they were dominated by General Motors Corporation employee-directors, and that Ross was given directives on occasion as to the operation of the business.

It further appears that in all matters of broad policy of the company, General Motors Corporation was in control through its employee-directors.

(8) Insofar as the formal requisites of the corporate entity were concerned, the separate existence of the dealership was maintained. The dealership purchased the products from General Motors Corporation on a cash basis. Motor vehicles purchased by Lincoln Park Buick Company from General Motors Corporation were paid for upon delivery.

The books, the premises and the business to all intents and purposes were separate and maintained apart from the General Motors Corporation. There was little intermingling of the two corporations, except insofar as the two company directors were concerned. It was never stated so far as the record reveals, that this dealership was anything except a corporate investment on the part of General Motors Corporation.

(9) Don Ross was in conrtol of the dealership insofar as its day to day operation was concerned; he employed and discharged employees and generally supervised sales in the operation of the business.

(10) Don Ross was a stockholder to the extent of nearly 25% of the capital investment of the company, although he did not have any voice in the selection of the directors.

(11) The negotiations and the sale of the commercial paper, i. e., the conditional sales contracts to the plaintiff were on the authority of Ross alone, as President of the dealership, and in contravention of the wishes of the Board of Directors.

This is evidenced by the fact that the sale of commercial paper over a period of more than 30 months was not an accepted practice in the area of the dealership, and it was Ross' idea that an extension of the time to 36 months would facilitate the sale of additional automobiles. It was he who solely negotiated for the sale of such paper to the plaintiff.

While the Board of Directors unquestionably had knowledge of it, it was never officially authorized or approved by the Board of Directors, and the testimony reveals that the Directors were opposed to the sale of paper to the plaintiff, due to a lack of collection facilities in the Chicago area.

These are the facts which bear upon the plaintiff's right to recover from General Motors Corporation.

The general rules of law with respect to the piercing of the corporate veil and disregarding the corporate entity are well established, but they offer very little aid when it comes to the decision of a particular case. The decisions are framed in broad principles and there are various theories used to justify the piercing.

Plaintiff in this instance has placed its principal emphasis on the so-called "instrumentality" or "alter ego" rule. This doctrine states that when a corporation is so dominated by another corporation, that the subservient corporation becomes a mere instrument, and is really indistinct from the controlling corporation, then the corporate veil of the dominated corporation will be disregarded, if to retain it results in injustice.

One of the clearest statements with respect to this area of the law is found in Lowendahl v. Baltimore & O. R. R. Co., 247 App.Div. 144, 287 N.Y.S. 62, 76, where the court stated:

"Restating the instrumentality rule, we may say that in any case, except express agency, estoppel, or direct tort, three elements must be proved:

'(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

'(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and

'(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.' See Powell, 'Parent and Subsidiary Corporations,' Chapters I–VI passim, and numerous cases cited." (See also Fisser v. International Bank, 282 F.2d 231 (2nd Cir.1960.)

Under this theory there must be complete domination as to the transaction in question, fraud or injustice must result from the use of such control, and the plaintiff's injury must be a proximate result of the control and breach of duty of the dominating corporation.

Plaintiff cites and largely relies upon Fish v. East, 114 F.2d 177 (10th Cir.

1940), where the court laid down this principle:

"The determination as to whether a subsidiary is an instrumentality is primarily a question of fact and degree. The following determinative circumstances are recognized:

"(1) The parent corporation owns all or a majority of the capital stock of the subsidiary.

"(2) The parent and subsidiary corporations have common directors or officers.

"(3) The parent corporation finances the subsidiary.

"(4) The parent corporation subscribes to all of the capital stock of the subsidiary or otherwise causes its incorporation.

"(5) The subsidiary has grossly inadequate capital.

"(6) The parent corporation pays the salaries or expenses or losses of the subsidiary.

"(7) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.

"(8) In the papers of the parent corporation, and in the statements of its officers, 'the subsidiary' is referred to as such or as a department or division.

"(9) The directors or officers of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation.

"(10) The formal legal requirements of the subsidiary as a separate corporation are not observed."

In other cases the rule is stated more generally as:

"When one corporation owns or controls the entire property of another, and operates its plant and conducts its business as a department of its own business, or as its alter ego it is responsible for its obligations incurred in so doing." Chica-go Mill & Lumber Co. v. Boatmen's Bank, 234 F. 41, 45 (8 Cir.1916). And again:

"When a parent corporation has control over the affairs of a subsidiary and manages the subsidiary primarily for the interest of the parent, the courts will look through the corporate entity. If a corporation is controlled by another and is manipulated by the parent for its own purposes and its own interests to the prejudice of the public welfare, it is necessary to hold the controlling party responsible." In re Investigation of World Arrangements, etc., 13 F.R.D. 280 (D.C.D.C.1952).

■ The cases simply lay down broad principles to guide the courts and the decision of each individual case rests almost completely upon the facts of that case. Ballantine on Corporations, § 122, Fletcher Cyclopedia of Corporations, § 41 (Vol. 1 Permanent Ed.), Industrial Research Corp. v. General Motors Corp., 29 F.2d 623 (D.C.Ohio, 1928), and also:

"In short it is the use to which the corporate form is put which controls and the facts in the particular case will determine the course of the relief. * * * However, the corporate form may be utilized as the instrumentality through which the injustice is worked, we need not indulge in mere semantics, for the circumstances of each case must justify application of the rule." Francis O. Day Co. v. Shapiro, 105 U.S. App.D.C. 392, 267 F.2d 669, 674.

As heretofore stated, in a pretrial conference, the question of fraud was taken out of this case, and even though it had been removed as an issue, we would say that the evidence did not show any fraud on the part of General Motors Corporation or its officers.

It cannot be denied that General Motors Corporation exercised rather close supervisory control over this dealership. It would seem from a study of the general policy of General Motors Corporation through its General Motors Motors

Holding Division in the organization of dealerships, that it was the general policy of General Motors Corporation to exercise such rigid control.

This is evidenced by the fact that it kept control of all Class A voting stock until the last certificate had been acquired by the investor, and that the purchase or acquisition of such voting stock could only be acquired out of the earnings of the dealership. Thus General Motors Corporation was providing itself with an outlet for its products for which it received cash payment at the time of the sale, and at the same time exercised considerable supervisory control over the manner or method by which these products would be disposed of.

The employees of General Motors Motors Holding Division who became directors of a dealership received no salary from the dealership, and the investor always became the president and the chief administrative officer, although he had no voting power insofar as the Board of Directors were concerned. The businesses were operated separately and apart; they maintained strictly separate corporate entities.

The history of this dealership was one of financial reverses from the very beginning. Apparently it never prospered and produced profits, and it became necessary, for the protection of its initial investment, for the General Motors Motors Holding Division to take over the complete operation of the agency from the first investor, and also following the failure of Ross to make a success of the agency.

In the purchase of automobiles by an agency, the question of paying for the cars as they are delivered becomes one of major concern, and arrangements were made through financial sources to finance these cars on what is ordinarily known as a "floor plan basis" so that General Motors Corporation received its money upon delivery of the cars, and as they were sold they were taken out of the plan and financed by the retail purchaser.

This would seem to be the ordinary method of conducting a business of this type, and there was nothing in the relationship that I am able to find here indicating any control by General Motors Corporation that would justify its liability for the obligations of the dealer.

The fact that General Motors Corporation saw fit to satisfy the claims of some of the large creditors of the dealership, under the circumstances, would not seem to justify holding it liable for all the obligations. It apparently was a gratuitous act upon its part.

The assets of the dealer provided a very substantial amount of money for the liquidation of its obligations, and only at the end did General Motors Corporation pay Associates Discount, Exchange National Bank, and one other small account. Such payments were quite likely made in order to maintain the prestige and goodwill of General Motors and its dealerships in the Chicago area, and do not of themselves constitute any admission of liability.

It will be noted that the bank, whose claim was paid by General Motors Corporation, also had a written guaranty from Don Ross and his wife to the extent of $50,000.00, and General Motors satisfied that claim against the dealership.

The transaction with which we are concerned here, i. e., the purchase of conditional sales contracts by the plaintiff, was never authorized by the Board of Directors, and as heretofore stated, was in fact, objected to initially.

Plaintiff apparently relied solely upon the guaranty of Ross and the Lincoln Park Buick Company to safeguard and protect its lien upon the cars represented by the purchase paper. It relied upon this understanding to the extent that it apparently never made any inquiry, or checked the records as to whether or not its liens were being protected until default occurred.

It would seem that the only theory upon which the plaintiff in this case could complain or seek to justify its

claim against General Motors Corporation would be with respect to its own transactions and not to the general operation or conduct of the business, and considering it in that light, General Motors Corporation or its employees had nothing to do with effectuating the arrangements or carrying them out. See Lowendahl v. Baltimore & O. R. R. supra. A mere knowledge on the part of the General Motors employees that there was such an arrangement between the dealership and plaintiff, would not render General Motors liable. Id.

There is no evidence indicating that the directors had any personal knowledge that the liens of the plaintiff were not being properly protected. This was a matter solely within the administrative functions of Don Ross in the operation and conduct of the agency business.

Plaintiff complains that the agency was improperly financed and was one of the causes of its financial difficulties. The evidence is not convincing on this issue and must be ruled against plaintiff.

Therefore, based on the record as a whole, and upon consideration of the facts as we have found them, taken in connection with the applicable law, it is our conclusion that the plaintiff has not met the burden of proof in showing that the relationships between the plaintiff, the defendant, and the Lincoln Park Buick Company would justify the piercing of the corporate veil and the holding of General Motors Corporation liable for the actions and conduct of Ross and the Lincoln Park Buick Company. In this we consider only the transactions in question in *this* case.

It is quite apparent that, due to the degree of control that is exerted by General Motors Corporation in these Motors Holding dealerships, situations could arise which would support the disregard of the corporate entity of the dealership, and holding liable of General Motors Corporation.

On the facts of this case, however, the court cannot justify the disregard of Lincoln Park Buick Company's corporate veil, under either the general or specific tests announced by the cases, supra.

The finding and judgment of the court is therefore for the defendant.