OMAHA POLLUTION CONTROL CORPORATION, a corporation, and the City of Omaha, Nebraska, a Municipal Corporation, Plaintiffs,

v.

CARVER–GREENFIELD CORPORATION, a corporation, and Fred S. Carver, Inc., a corporation, Defendants.

CARVER GREENFIELD CORPORATION, a corporation, Third Party Plaintiff,

v.

KIRKHAM–MICHAEL AND ASSOCIATES, INC., a corporation and Stearns-Roger Corporation, a corporation, Third Party Defendants.

Civ. No. 03693.

United States District Court, D. Nebraska.

April 1, 1976.

---

William G. Campbell, and Richard A. Spellman, of Kutak, Rock, Cohen, Campbell, Garfinkle & Woodward, Omaha, Neb., for Omaha Pollution Control Corp.

Kent Whinnery, Asst. City Atty., Omaha, Neb., for City of Omaha.

John T. Dolan, and Robert W. Delventhal, of Crummy, Del Deo, Dolan & Purcell, Newark, N. J., for Carver Greenfield Corp.

C. L. Robinson, of Fitzgerald, Brown, Leahy, Strom, Schorr & Barmettler, Omaha, Neb., for Fred S. Carver, Inc.

Charles F. Gotch, of Cassem, Tierney, Adams & Henatsch, Omaha, Neb., for Stearns-Roger Corp.

## MEMORANDUM and ORDER

VanSICKLE, District Judge.

Omaha, Nebraska is on the Missouri River about 20 miles north of the mouth of the Platte, and the same distance east of the westward reach of the Platte. Located as it is at the focal point of inland commerce with the western half of the North American Continent, it naturally has developed into a rail and highway center which serves the agricultural lands that stretch in every direction from it. It grew first into a livestock gathering point, and then into a livestock processing center.

By 1966, there were from 15 to 19 packing houses located in the Papillion creek watershed, which encompasses the south area of Omaha. These packing houses were slaughtering and processing over four million head of cattle, sheep, and hogs annually. The waste material from the kill floor and other packing house operations was being washed down into the Omaha city sewer system. The burden on the sewer system from this packing house area, in 1966, amounted to approximately one hundred thousand pounds of grease each day, and one hundred tons of solids each day. Those solids were principally paunch manure which consists of the undigested, or only partially digested, contents of the first stomach of cattle. These materials were carried through the sewers by twelve to fifteen million gallons of water each day. Since the existing sewer system could not possibly handle this burden, it was dumped into the Missouri River as raw sewage, principally through the Monroe Street outfall, which served the Omaha packing house area.

The Missouri River downstream communities, and the United States government vehemently resisted as the buildup of pollution became increasingly intolerable. Finally, at the interstate River Pollution Conference on March 29, 1966, Omaha received an ultimatum: Stop polluting the Missouri River with packing house wastes by December 15, 1966!

A shutdown of the packing industry would mean a job loss of six to seven thousand people. So a solution had to be found. But the city was already committed to the limit of its financial capacity. A part of its financial picture included a ten million dollar Missouri River Treatment Plant, which was engineered to handle the city's light industrial waste and domestic waste. The plant was constructed in two units—one serving the north half of Omaha, the second serving the south half of Omaha. While the south plant could handle the final stages of packing house waste water processing, it could not do so until the bulk wastes from the packing houses had been separated.

During 1965, the critical situation in Omaha came to the attention of a representative of Fred S. Carver, Inc., Mr. Axt, who went to Omaha to suggest that a process known as the "Carver-Greenfield" process could solve the city's woes.

By December 1, 1965, Fred S. Carver, Inc., had developed their presentation to the point of a telegraphed offer which included:

a. Financing, engineering and operation of a sewer collection system for packing house wastes.

b. Installation of Carver-Greenfield plant to remove paunch manure, fat, oil and other packing house waste from the sewage stream.

c. Return of the cleaned sewer stream to the city sewer system.

The telegraph offer also suggested that for a 5% cut of the profits, Fred S. Carver, Inc., would pledge its line of credit to assist the city's financing. And it recited that it had authorized Stearns-Roger Corporation to do a feasibility study of the concept.

Fred S. Carver, Inc., in fact authorized the study to be paid for from anticipated proceeds of a suggested City of Omaha bond issue.

To digress briefly, Charles Greenfield had long been studying the processing of foods. He interested Fred S. Carver, Inc., manu-

facturer of hydraulic press equipment, in his research and development and ultimately received funding and support from them. Hydraulic presses fitted into the Greenfield process as preliminary squeeze drying steps in the process. As Fred S. Carver, Inc., became interested, and as the Greenfield process developed, it became known as the "Carver-Greenfield process." By 1961, the Carver-Greenfield process had been adapted to sewage waste disposal, to a limited extent.

Returning to the Omaha picture, by February 3, 1966, Fred S. Carver, Inc., had given to Omaha a "detailed engineering report" which set out and explained the proposed Carver-Greenfield process of Omaha.

The schematic drawing (Ex. 7b) Appendix I,* contains the fundamental flow pattern and substantially the large hardware as the plant was finally constructed.

The problem of financing any undertaking to solve the city's difficulties was constantly before the city. To solve that problem, Fred S. Carver, Inc., apparently at the suggestion of Robert J. Kutak suggested in their initial proposals that Eastman-Dillon of New York City be brought into the conversation.

By the end of March, 1966, the City of Omaha had organized a non-profit corporation named the Omaha Pollution Control Corporation (OPCC) as an operative arm. OPCC had undertaken to review alternative solutions to the problem, and as a part of that program explored financing avenues.

During this same time, i. e., by April 13, 1966, Fred S. Carver, Inc., created Carver-Greenfield Corporation (CGC). In its infancy, CGC was housed with and supported by Fred S. Carver, Inc., and in fact, wherever,

during its Omaha activity, CGC could not fund itself out of the cash flow from OPCC and other, lesser ventures, Fred S. Carver, Inc., would assist to the best of its ability by making advances to CGC. But the organization of CGC reflected pressures beyond that of creation of an operative company. The original stockholders of Fred S. Carver, Inc., William and Robert Carver, sons of the founder, were distressed by the scope of the Omaha exposure, and the aggressiveness by Charles Greenfield, Robert Axt and Philip Haselton. Their dampening influence was also felt to be a hindrance by the more aggressive exploiters of the Carver-Greenfield process. The directors of Fred S. Carver, Inc., and CGC were not identical, although several members served on both boards. In fact, with reasonable dispatch after Carver-Greenfield Corporation was created, the Carver brothers traded down their equities in Carver-Greenfield Corporation in order to recapture Fred S. Carver, Inc. Then on November 25, 1969, the Carver brothers sold Fred S. Carver, Inc., to Sterling, Inc.

Returning to the Omaha story: Eastman-Dillon and Union Securities & Co., had expressed interest in financing the project. To support any financing decision, and to bolster the program of OPCC, a feasibility study of the project was authorized by OPCC. The large engineering and development firm of Stearns-Roger Corporation of Denver, Colorado, was employed to make the study on June 3, 1966. After first getting written assurance from Fred S. Carver, Inc., guaranteeing 50% of the cost should the feasibility study prove negative, OPCC ordered the study. The study was dated July 22, 1966, although it was released some two weeks later.

The study gave enthusiastic approval to the project.[1]

---

* The appendix is to the opinion as filed in the office of the clerk and is not reproduced with the published opinion.

1. A peculiar aspect of the development of this project in its early stages is the absence of any articulated resistance. No one in the community seems to have arisen to do the job of the Devil's Advocate. The dire emergency which

the community faced, plus the suggestion that a bad problem could become a valuable benefit—the idea of profit from sewage—apparently carried everything before it. For example, see the tone of the article written by William E. Korbitz and E. Bruce Meier, as published in the April 1968 Journal of the Water Pollution Control Federation.

But during the developmental period, a problem arose as to possible tax liabilities incurred or incurrable by OPCC should it effectively produce an income from the processing of sewage waste. In the light of the anticipated profits, this question was critical to the financing scheme. But it was not resolved until September 18, 1967, when the Director of Internal Revenue executed an opinion that income to OPCC would be non-taxable.

With the resolution of the tax problem, Omaha Pollution Control Corporation started development.

In the meantime, on November 12, 1965, a formal announcement was made of CGC's organization. From this time forward all documents were signed by CGC. Fred S. Carver, Inc., continued in the picture only incidentally and casually. For example, when a proposed creditor wrote to inquire about CGC's line of credit, Mr. Kutak, counsel for OPCC, responded that the creditor could rely on the funding furnished by OPCC. Again, after the project had degenerated to its ultimate shambles, when a creditor wrote OPCC asking for his money, Mr. Kutak advised the creditor to look to CGC. Thus it appears as a matter of fact that OPCC did not concern itself in any degree with Fred S. Carver, Inc., after the creation of CGC.

By December 1, 1966, a bond issue having been authorized by the City of Omaha, secured by the credit of Omaha, and a pro-gram of financing having been assured, the OPCC engaged CGC to construct the packing house waste basins and processing plant. This agreement was replaced by an Amended Agreement, dated September 20, 1967.

The Amended Agreement by its terms cancelled and replaced the earlier agreement, and became the operative agreement for construction purposes. The construction of the project consisted of four phases, as follows:

1. Collecting sewer system—to be engineered, designed and constructed by third parties.

2. Gravity basin system—to be engineered, designed and constructed by third parties.

3. Flotation system—to be designed and engineered by Kirkham-Michael & Associates, Inc. (KMA), and to be constructed by CGC.

4. Processing plant—to be designed, engineered and constructed by CGC.

On December 1, 1966, CGC entered into a written agreement with Stearns-Roger Corporation whereunder Stearns-Roger Corporation agreed to design and engineer the processing plant. This agreement was amended by the execution of a "fixed price" contract between the parties dated October 10, 1967. On May 28, 1968, CGC entered into a construction contract with Koppers Company, Inc., whereunder Koppers agreed to perform the construction of the air flota-

---

The Stearns-Roger people who were employed to do a feasibility study would seem to be the logical ones to serve in the Devil's Advocate role. But they did no independent research on the project. In fact, they limited their preparation to superficial examination of a few plants, the gathering and review of research by others, and arithmetical projections from volume estimates. They did not conceive it to be in the scope of their study to do more. See deposition of Neil McLagen pages 47 and 48. "In preparing the scope of the work for the feasibility study, we did not anticipate the need for testing." And in fact the ultimate evaluation of the Carver-Greenfield process is couched in these words: "The Carver-Greenfield process will successfully dehydrate the mixture and separate the grease from the solids; since the process has demonstrated its capacity under similar and more demanding circumstances," page 39 feasibility report, Ex. 24A.

Stearns-Roger Corporation recognized that "skimmed and settled solids and grease . . . will decompose into foul, odorous sewage waste unless dried in a relatively short period of time." (Feasibility report, Ex. 24A, p. 20.) It also recognized that "once the proposed system is in operation, lengthy shutdowns due to equipment failure cannot be tolerated." (Feasibility report, Ex. 24A, p. 23.) Still, at the time of the feasibility report, Stearns-Roger Corporation had available to it for analysis by its considerable engineering and mechanical staff, no more than the schematic flow diagram (Ex. 7B, Appendix I. [see footnote *, page 1074]) No plans and specifications for the Omaha plant were prepared until June 5, 1968.

tion basins and the processing plant and on July 24, 1968, CGC assigned said construction contract with Koppers to OPCC.

In addition to the contracts referred to above, on May 17, 1966, OPCC entered into an agreement with KMA whereunder KMA agreed to act as independent engineer for the entire project on behalf of OPCC, provide engineering and design of the air flotation system and the design, engineering and construction of the gravity basins. Other basic contract documents pertaining to the construction, financing and operation of the project consisted of a lease-purchase agreement between OPCC and the City of Omaha dated September 7, 1967; a packers contract dated September 7, 1967; an operating agreement between the City of Omaha and CGOmaha dated September 7, 1967; a trust indenture dated September 1, 1967; and a construction deposit agreement dated September 1, 1967.

Under the terms of the lease-purchase agreement, the City agreed to pay to the Trustee the sum of $180,000 semiannually to be calculated from the date on which the revenue bonds were issued and sold. The first payment the City was obligated to pay became due on or before March 1, 1970 and the second payment became due on September 1, 1970. The contract documents provided that the payment of the rental by the City would be obtained through the contribution made by the packing industry arising out of a formula of a few cents per animal killed, and spelled out in the packers contract, with the balance to be contributed by the operator in accordance with a formula set out in the operating agreement.

The basins were constructed substantially as designed, except that the air flotation enclosure—the building housing the air flotation basins—was deleted by change order number 1 to the Amended Agreement.

The specifications attached to the Amended Agreement establish the separation points between the basin system and the Carver-Greenfield processing plant. According to those specifications, CGC's design and construction responsibility began at the delivery end of a 24 inch conveyor

(ribbon screw) which transported a combination of settled, wet solids, and floated grease to the live bottom bins. Also, it began at the point where skimming pumps and a pipeline from the air flotation basins delivered the floated grease to the two skimming tanks.

The design of the basin system was subject to the approval of CGC. (See Sec. 1.1., Amended Agreement, and Pl. Ex. 739.)

Construction of the basins and the processing plant was begun in June of 1968. The basins and processing plant were substantially complete and ready for attempted operation by November of 1969. The plant was accepted from Koppers, Inc., as substantially complete in January of 1970.

In the meantime, CGC had created a subsidiary corporation entitled Carver-Greenfield Omaha, Inc., (CGOmaha). By the agreement dated September 7, 1967, between the City of Omaha and CGOmaha, provision was made for CGOmaha to operate the plant upon its being accepted by OPCC under sections 1.3 and 1.4 of the Amended Agreement.

During the construction phase CGC had employed Penn Associates as their construction engineer. Penn Associates consisted of Dan O'Brien and his son, and others. Dan O'Brien had agreed to accept employment by CGOmaha when it assumed operational responsibility. Anticipating the time of operation, CGC, acting through Penn Associates and Dan O'Brien, undertook, beginning in September and October, to hire and train personnel who, it was planned, would be trained by CGC under section 1.3 of the Amended Agreement, and would perform the five day consecutive operation test as provided in section 1.4 of the Amended Agreement.

The misadventures of the combined basin area and processing plant fall into five stages, or periods. To better present the problems and what or who caused them I will review them with reference to these stages. They were:

1. The initial start-up period—from the beginning of attempted operation (October-November 1969) until the

beginning of the January-February cold spell of 1970;

2. The extension of the start-up period, from the beginning of the 1970 cold spell to the identification of the soap problem in March of 1970;

3. Plant operational problems from the identification of the soap problem to the July 30-August 1, 1970 downpour and flood;

4. Clean-up operation after the flood, until August 14, 1970, when CGC personnel left the plant; and

5. Clean-up, operation, and finally, closedown and conservation of the plant.

Also, it may be helpful to review what Omaha had, or thought it had, upon completion of the processing plant.

First, it had approximately 5.5 miles of common collector sewers which gathered the packing house wastes, including kill floor and cleanup washings, and delivered them by gravity flow to the basins; and in an emergency could bypass the basins and dump the flow into the south unit of the Missouri River Treatment Plant, or even directly into the Missouri River.

Second, through its agent OPCC, it had a basin system consisting of four gravity separation basins and four flotation basins, usable, all or some at the same time, in series or in parallel, which had the capacity to separate out solids and fats to a point where the effluent would contain no more than 300 parts per million of grease and 400 parts per million of solids. (Sec. 5.5 Amended Agreement.) At that level of pollution the effluent could be put through the south unit of the Missouri River Treatment Plant and cleaned up by that plant to a level acceptable for the Missouri River.

Finally, Omaha had, through its agent OPCC, a processing plant capable of accepting as raw material the fatty wastes and the solid wastes from the basin area and reducing them respectively to grease of a purity sufficient to have a market value, and dry solids of a dryness sufficient to allow its marketing as recycled feed, fertilizer, or fuel. Of these three, the dry solids appeared most likely to be usable as fuel. (App. II) *

It necessarily followed that if the Carver Greenfield processing plant were not operational the 5.5 miles of sewer and the eight basins could be utilized to cleanse the packing house sewage; but use of those facilities without the processing plant would require an awkward, messy and expensive transport system to move the separated greases and solids to landfill or other disposal areas.

A general description of the basin system and the processing plant, with the problem areas identified, is necessary if we are to follow the history of the plant operation.

At the point of delivery from the collector sewers to the basin area the effluent came through two sewer line gates. Just before entry to the basin area the effluent passed through bar screens designed to hold back large objects such as bones, sections of intestine, chunks of meat, tin cans, cloth, tools and other solid objects. These bar screens were kept clear of obstacles by scrapers, teethed like lawn rakes, which cut in at the bottom of the bar screen and scraped it to the top, at which point the solid wastes were delivered off to one side to a container for further disposal. In fact, with the removal of adequate housing (Change Order No. 1, Amended Agreement) and the advent of cold weather, the bar screen cleaning devices did not operate successfully.

Upon the sewer effluent passing the bar screens it flowed into the gravity separation basins. The entrance baffles did not control the flow pattern properly—in the gravity separation basins or the air flotation basins, or both—and had to be revised and redesigned in order to effect the proper control, after construction was certified complete. In the gravity basins the solids were dragged back to the influent end of the basin, deposited in a sump and raised by bucket conveyor to a mixing point. The

* See footnote *, page 1074.

buckets had been constructed with drainage slots in them. In theory, the solids would drain as they were elevated. In fact, the upper buckets drained into the lower buckets, creating a cumulative wash which kept the buckets nearly empty of solids. This was corrected by sealing the drainage slots in the buckets. And, during the cold weather, whenever the basins were freezing, the buckets also froze. The grease floating on top, was skimmed to the far end of the basin, gathered in a trough and conveyed by ribbon screw conveyor to the mixing point; there the grease and solids were remixed and conveyed by screw conveyor to the live bottom bins.

After removal of the solids and grease at the gravity basins, the sewer water could be cut back to the city sewer or sent on to the air flotation basins. In the air flotation basins, bubbles of air under pressure were pumped into the sewage. These bubbles picked up fine solids and grease and carried them to the surface. Heavier solids gathered on the bottom of the basins. These heavy solids were scraped to the influent end of the flotation basin and pumped back into the sewer line to be redeposited in the gravity basin gathering system. The grease and fine solids were skimmed to the influent end of the basin, gathered in a trough and conveyed by ribbon screw conveyor to a pump station, where they were pumped to the skimming tanks.

The ribbon screw conveyor was another source of cold weather trouble. Unlike a screw conveyor, which looks like a continuous plate or disk wrapped around a shaft (for example, a grain auger) the ribbon conveyor may be likened to a continuous wheel rim mounted on spokes around a shaft. In cold weather this conveyor jammed up with frozen material and became inoperable.

The basin area, as designed and constructed by KMA and approved by CGC, had its share of operational wrinkles which could not be fully corrected until after the January-February 1970 winter had passed. And when operational it did not in fact reduce the sewage to the standard required by section 5.4 of the Amended Agreement— at least at first. However, I find as a fact that this was not reason to excuse the non-operation of the processing plant. Sewage or inner-natant, went not to the processing plant, but back into the city sewage system for treatment at the Missouri River Treatment Plant.

Other problems in the operation of the basins arose when the flow was stopped. In that static condition putrefaction began. This caused solids to rise to the top and be skimmed into the skimming conveyor system where they blocked the grease flow. It also caused extensive air pollution.

The problems of the basin area were ultimately worked out between OPCC and KMA.

Turning now to the Process Plant. The flow pattern of the process plant is generally represented by the preliminary schematic process drawing furnished by Fred S. Carver, Inc., (Ex. P–7B, App. I).* The major change between that process and the one actually constructed was that in the Omaha plant the expeller system consisted of a hexane solvent process whereby the last grease was separated from the solids.

In the process plant, a problem developed early in the live bottom bins. Unless the material was moved along it tended to solidify, thus holding the material above and away from the augers mounted in the bins. The bins are approximately six feet wide, eighteen feet high and twenty-two feet long. They are emptied by five augers laid in troughs the long length of the bin. The augers spanned the entire length of the bin without support except at the ends. The center auger was directly powered by a seven and one-half horsepower electric motor and the side augers were geared into it. (Ex. 673, p. M12, plans of processing plant). The auger system was underpowered; in fact, CGC converted to fifteen horsepower motors and still found it difficult to get the augers started. The auger manufacturer also recommended that the augers be sup-

* See footnote *, page 1074.

ported by bearings at the center, but to my knowledge that was never done. Later, the auger gear system was changed so that augers two and four were powered and augers one, three and five ran off of augers two and four. CGC replaced not only these motors, but also several other electric motors with motors providing greater power. CGC also replaced at least some of the motors with some differently encased, in order to protect them from the plant conditions.

The next problem developed in the skimming tanks. Both the fluidizing tank, M5, and the skimmings storage tank, M6, of exhibit 673, were constructed to utilize internal agitators. In fact one of the tanks had to be baffled, and the agitators on both tanks developed operational troubles. The activators, even when designed and installed, proved inadequate to keep the solids in suspension in the grease, as the solids bridged in the tanks and plugged the outlets. As the solids went through the system they were reduced by prebreakers and disintegrators to smaller units, and they were also subjected to mechanical compression to squeeze out the water. Power plants for these units broke down and the flow lines and pumps for these units repeatedly plugged. At least during the cold spell, these problems were blamed in part on the weather.

In theory the solids from the live bottom bins and the fats from the skimming tanks were mixed together in the fluidizing tank and enough fats were added to produce a slurry which could be moved by pump and pipeline through the process plant. The slurry was then pumped into a three stage evaporator system in order to evaporate out the water. The three stage evaporator system actually consisted of three basic units. Hot steam was introduced into the stage three unit; as it cooled, pumped to stage two; as it cooled, pumped to stage one. (See the 3 evaporators in App. I.) * Condensation was gathered and returned to the boiler. The slurry was sprayed on top of the stage one unit, collected at the bottom,

pumped into the stage two unit, collected at the bottom, pumped into the stage three unit, collected at the bottom. Then the slurry, consisting only of solids and fats, was pumped to the solvent building for separation.

The slurry was pumped to the solvent building through a three inch line known as SL 17 (slurry line 17). (See Ex. 673, P5 and P19.) It was in this line that the "soap problem" caused the most consternation. SL 17 delivered the slurry to two centrifuges which separated the fats from the solids. In this step hexane was used to assist in the process. The hexane was then separated from the solid and fat products by a desolventizing process. The hexane was reclaimed for reuse, the fats were pumped to storage tanks, and the solids conveyed to a silo.

In fact, the power estimates were too low throughout the plant as designed, and many of the electric motors had to be replaced with larger units. And, while the "soap problem" was developed in the evidence particularly as to SL 17, in fact the problem appeared in all the slurry pumps and lines.

A substantial element in the plant requirements was control of air pollution. This was designed to be controlled by gathering the air in the process plant and blowing it over the top of the boiler flames, thus burning out the odiferous matter. A three to four foot blower fan was mounted on the boiler room floor between the two boilers for this purpose.

Hexane being a volatile and dangerous compound, the solvent plant was housed in a separate building, some fifty feet away from the process plant.

1. *The initial start-up period from the beginning of attempted operation, October-November 1969 until the beginning of the January-February 1970 cold spell.*

As discussed in the course of my explanation of plant operations, wrinkles in the mechanical and design aspects of the basins were early discovered. KMA and OPCC

worked their problems out to the point where the basins were operable, although the effluent from the basins had not been brought down to the standards recited in sections 5.4 and 5.5 of the Amended Agreement. These problems did excuse, at least temporarily, some of the difficulties of the processing plant.

On December 5, 1969, CGC attempted five days of continuous operation in compliance with section 1.4 of the Amended Agreement. The effort failed. In fact, the plant could not be kept in operation even 60% of the scheduled time. I find that operational failures of the process plant up to the time of commencement of the cold spell, while due to defects in the plant, were excusable because of design and mechanical defects in the gravity and air flotation basin area which interfered with the delivery of raw material for processing. (While CGC had authority for design approval under section 1.1 of the Amended Agreement, the actual control and responsibility for construction and design lay with KMA.)

2. *The extension of the start-up period from the beginning of the cold spell to the identification of the soap problem in March, 1970.*

The extensive problems made apparent by the operational efforts of November and December, 1969, and January, 1970, caused the interested persons to organize an "ad hoc committee" at the end of January. The City of Omaha, OPCC, Stearns-Roger Corporation, KMA and CGC were all represented on the committee. For field work at the plant site there was organized an "on site committee" consisting of operational experts ordered in by the various interested parties. Actual management of the plant was left in CGC, in accordance with the Amended Agreement. (CGC had not yet delivered an operating plant.)

In January, 1970, there was a fire and explosion in the boiler room at the site of the blower fan. Out of this explosion there developed a damage claim. The amount of the settled claim was paid by the insurer, but some of the funds have been held by

OPCC. With the coming of the extreme cold wave of January and February, 1970, the entire complex was shut down by the weather. The basin area froze over. The material froze on and in the conveyors, and the lines were frozen or otherwise plugged in the process plant and solvent plant.

In the midst of the fire, boiler explosion, plugged or frozen lines, and basin area freezeup, the first payment to the trustee came due! As earlier mentioned (and see Ex. P–61) the bond retirement payments became due each September 1, and the trustee was to receive one-half of that payment by February 28 and one-half of that payment by August 30. Under the terms of the lease-purchase agreement between OPCC and the City, the City's first rental payment, if the plant was rentable, was in the amount of $128,000 which, when added to the packing plant per head kill fee, would have made up the February payment. Since the plant was not rentable, the City demanded that the payment be made by CGC, and got it by paying CGC on Change Order No. 7, and requiring CGC to return that money to be applied against the bond liability. (See Ex. P–62, Change Orders.)

I find that during the period of the cold spell, the extensive problems in the uncovered basin area excused non-operation of the processing plant in that the decision to leave the basin area uncovered was a decision made by OPCC, and was contra to the recommendations of CGC. Further, the risk of adverse weather to an uncovered basin area was foreseen by the City, its operative arm, OPCC, and their agent, KMA.

3. *Plant operational problems from the identification of the soap problem to the July 30-August 1, 1970 downpour and resultant flood.*

The evidence highlighted two overriding aspects of this period. The first was a problem of air pollution and street, neighborhood pollution. The second was a problem of continued processing and solvent plant breakdown and operational frustra-

tions. And, of course, a cloud over the whole summer's operations was the City's rental payment due on August 30.

As to the problems of air pollution: No matter how steadily the basins operated, they were uncovered and odors from them could not be controlled. The basins and plant were adjacent to heavy industrial, light industrial and residential areas. I find as a fact that until the basin area was covered and air pollution was controlled, OPCC could not fault CGC for air pollution it also was causing.

However, the basins, during the period of March through July, 1970, were operating effectively and were separating solids and fats which could have been processed in the plant had the plant been operational. These solids and fats had to be trucked out, through urban areas to disposal areas. This did create annoying and repulsive conditions in the community and did add to the dissatisfaction and disillusionment of the community.

In 1963 the Carver-Greenfield process had been sold to the City of Hershey, Pennsylvania. (The 1970 census shows Hershey to be a city of 7,407 persons.) The community wastes of Hershey came primarily from the industry of the Hershey Candy Company, sanitary (domestic) waste from the residential community, some packing houses, and tourist (restaurant, etc.) waste. (Testimony of Mr. Greenfield.)

The process was designed to produce a dry product capable of disposal by burning. The Hershey plant was completed in 1964. It started up and the lines plugged. Soap was determined to be the problem, so the plant was briefly acidulated and then, since

a marketable grease was not important, petroleum oil was used as a carrier instead of animal oils, and the plant now functions without difficulty. Omaha, OPCC, Stearns-Roger and KMA were all referred to the Hershey plant and their agents visited the plant and were informed of the soap problem. But either they did not see its importance or CGC allayed their fears, because no notice was taken of the matter. I find that CGC personnel knew at the time of the design of the Omaha processing plant that animal fats, when combined with certain foreseeable hydroxides likely to be found in community waste and raw water would and, under foreseeable conditions did, in fact, combine to form soap.[2]

Carver-Greenfield did examine and run tests at the St. Joseph, Missouri sewage basin plant, including the transporting of sewage effluent to other plants and the Carver-Greenfield laboratory to determine the relative amounts of fats, solids and water in the sewage. But it is clear that they made no effort whatever to do any chemical analysis of the material which was going into their processing plant. This was true even after the soap problem was identified. Although the City had passed an ordinance controlling the material to be washed into the packing house gathering sewers, CGC made only one complaint along the way and made no real effort to police the material coming into the sewers. And the plant was sold to the City of Omaha as being able to separate or process all of the city's waste—industrial, packing house and sanitary.

On or about March 17, 1970, Carver-Greenfield engineers identified the matter

2. Chemists define soap as the metal salts of certain organic acids. Frey, *College Chemistry*, p. 447. Soaps are usually made from animal or vegetable fats, oils and greases, formed by the interaction of fats and oils with alkali. Sodium hydroxide and potassium hydroxide, both very common alkalis, when in an aqueous solution and exposed to tallow, grease, vegetable oils such as coconut oil, decompose in a process called saponification, forming glycerin and the metal salt of the fatty acid. Other metal salts, of course, will react in much the same way. Funk & Wagnalls, *Universal Standard Ency-*

*clopedia*, Vol. 21, p. 7831. A simple formula for making soap is: Take 6 pounds of potash, 4 pounds of lard, and ¼ pound of pine resin. Mix the batch and let it sit for 5 days. Put the mess in a 10 gallon can of warm water and stir twice daily for ten days. Result—soap; not for your lady fair, but soap.

The circumstances of certain hydroxides, animal fats, long standing, occasional movement or mixture, and warm water were repeatedly occurring in the processing plant vessels and flow lines during spring and summer of 1970.

which was plugging the lines as a waste "soap." When the plant was shut down for a short period the "soap" would coagulate throughout the system in the lines, the pumps and the centrifuge (only one was on line). Particularly it would plug SL 17, the slurry line which carried the solids, dried of water but conveyed in animal fat, from the processing plant to the solvent building.

Once the soap was identified, CGC undertook to acidulate the slurry as had been done temporarily at Hershey. This was first done by hauling carboys of sulphuric acid from the floor of the processing plant to the top of the fluidizing tank by a pulley assembly, and then dumping the carboys into the top of the fluidizing tank. Later the acid was poured into the second slurry fluidizing tank. The manual dumping of carboys continued until April 15, 1970. During this time, about March 31, 1970, the third stage evaporator lid and safety valve blew off. (See Exhibits 400 and 401.) On April 15, 1970, a pump and line were rigged to lift the acid from a storage tank on the ground to the top of the slurry tank. But within about four hours the acid burned out the pump. So on April 16, 1970, the system was again revised to use air pressure to lift the acid. This pressure system continued to be used until the plant was shut down.

When the air pressure system had been established so that a valve-controlled flow of sulphuric acid into the slurry tank could be maintained, CGC demanded of OPCC that it fund the construction of the necessary acidulating equipment. Since this acidulating equipment would have to be acid resistant—for example, stainless steel instead of carbon steel—the cost of the acidulating equipment would have been approximately $60,000.

This demand was refused by OPCC, which claimed that the failure to foresee and control the soap problem was a design failure and the responsibility of CGC. And this was one of the factors which resulted in the final breakdown among the parties.

Mr. Bonanno, of CGC, worked out a formula for acidulating slurry and set up a control to assure that the sulphuric acid did minimal damage.[3] The plant was constructed of carbon steel, so that stringent controls over the acid were necessary. However, as Mr. Carr of CGC admitted, the final system of acidulating called for 42 gallons of sulphuric acid every two hours when soap buildup occurred. And if the pH level dropped to 5.5, the acidulating had to stop. But control of acid flow by measuring the soap content of the slurry involved

---

**3.** *Defendants Exhibit 859 recites:*

Knowing the percent of soap in the oil to be acidulated proceed as follows:

1. Determine the total pounds of soap in oil to be acidulated.
2. Divide pounds of soap by 3. This is equal to the amount of sulphuric acid to add to get 100% reduction of soap, however, use only 75% of that value.

EXAMPLE:

A. 4,000 gallon oil to treat x 8 = 32,000 lbs.
B. 10% soap = 3,200 lbs.
C. $\frac{3200}{3}$ = 1,066 lbs. acid
D. 75% x 1055 = 798 lbs. of acid to use
E. Concentrated acid has a weight of 14.7 lbs./gallon, therefore,

$\frac{798}{14.7}$ = 54 gallons of acid to use for the acidulation of 4,000 gallons of oil.

*Defendants Exhibit 860 recites:*
METHOD OF ACIDULATION

1. While agitating, add 3 times the calculated acid weight water to a charge of oil to be acidulated.
2. Heat to 170° F.
3. Put on safety clothing and gloves and add carefully and slowly the calculated amount of acid through a long plastic hose. Steam will be formed during the addition and care must be taken to avoid an excess of rapid heat formation and foam.
4. When all the acid has been added, continue agitating for 10 minutes.
5. Take a sample of the oil to the laboratory for a pH reading. If lab man is not present, check pH as follows:

Take an ounce of acidulated oil and add an equal amount of water. Heat on hot plate

a four hour lag between taking the sample and test results.

The pH test is a color test using a type of litmus paper, or pH paper. A more sophisticated meter is also available, but the paper test was the test principally used in the plant. If the acid reaction drops to 5.5 or below on the arbitrary scale, the acid is strong enough to do extensive harm to carbon steel. Of four pH tests recorded by Mr. Carr, three were below 5.5. For quick reference the scale may be drawn out as follows:

```
                      PH
ACID    3 4 5 6  <--7-->  8 9 10     BASE
                  Neutral
(Predominance of               (Predominance of
Hydrogen ions)                 Hydroxyl ions)
```

By early June of 1970 it was apparent to the City that there would be no income from the plant with which to meet the August payment. Also, since an operative plant had not been delivered pursuant to sections 1.3 and 1.4 of the Amended Agreement, no rent was due from the City. Therefore, in June OPCC attempted to require CGC to release the plant to its owner, OPCC, and install CGOmaha as operators. However, CGOmaha refused to undertake the operation of the plant on a commercial basis. This was the situation on July 30, 1970.

I find as a fact that substantial deterioration of the carbon steel elements of the plant was caused by the acidulation process used by CGC. (See Exhibits 372–5 and 387–9.) I further find as a fact that CGC had not maintained the plant in an efficient manner and that the corrosive effect of the sewage odors and fluids had done substantial damage to the plant generally. (See other photographic exhibits.) I find from the testimony of Mr. Sims and from the appearance of the plant, that by the time the plant was taken over on August 14, 1970, it had deteriorated through about 60% of its useful life, and that this deterioration was the responsibility of CGC. I further find as a fact that non operation of the process plant was not excusable as to CGC, and, therefore, by June 1, 1970, CGC had failed to perform its contract within a reasonable time.

4. *Cleanup operations after the flood and until CGC personnel left the plant.*

On July 31 and August 1, 1970, there was a torrential downpour in and around the City of Omaha. This resulted in a flash flood of surface runoff waters at the plant site. Because certain of the sewer flow gates were chained in order to control the sewer flow pattern, the personnel on duty could not hold out backup waters from the sewer system. However, the bulk of the plant inundation was due to surface water runoff.

This flood necessitated the dismantling and repair of all mechanical units situated below ground level, and the rewinding of all electric motors which had been submerged. The cleanup work was still in progress on August 14, 1970, at which time the City of Omaha took over the plant and evicted CGC personnel.

I find as a fact that the interruption of operations from August 1, 1970 to August 14, 1970, and the damage by flooding was caused by an act of God.

5. *Cleanup, operation, and finally, closedown and storage of the plant.*

About August 14, 1970, CGC gave notice that they were vacating the plant. On August 15, 1970, the City of Omaha took possession of the process plant and evicted CGC personnel.

---

to boiling, while stirring. Place strip of pH paper in the water portion of the mixture and compare it to the color chart on the pH package. It should not read lower than 5.3 pH.
6. Oil is ready for use.

After CGC personnel were evicted, the City of Omaha attempted to clean up the plant and operate it with their own personnel. This was not satisfactory so, beginning on or about January 1, 1971, Process Operators, Inc., plant operational specialists, contracted with, and did put the plant into limited operation. They were not successful in bringing the plant to a commercial operation level, however, and were released approximately September 1, 1971.

I find as a fact that the cost of services of Process Operators, Inc., and the cost of alterations and repairs effected by them and acts taken and things done to make the plant operable were reasonably necessary efforts to bring the plant to an operable condition, and not chargeable to CGC. I further find that the costs incurred by the City of Omaha in its efforts to clean up after CGC was evicted, are not chargeable to CGC.

I also find as a fact that the processing plant was inadequately designed, engineered and constructed, in that CGC did not provide adequate power for the units; did not provide adequate protection from the corrosive nature of the material to be handled; did not provide adequate coagulation control of the material processed; did not substantially complete the construction according to the plans and specifications; and did not produce a plant capable of commercial operation for five consecutive days, as required by section 1.4 of the Amended Agreement.

### SUMMARY AND ANALYSIS OF THE PLEADINGS

In final amended form, the pleadings begin with a complaint by OPCC and the City of Omaha.

In their First Cause of action, Plaintiffs allege that Fred S. Carver, Inc., and later CGC represented that their process would handle the packing industry wastes of Omaha, and that they could and would design and construct a plant able to do so; that CGC contracted to design, build and start up such a plant and breached its contract by failing so to do—i. e., an action for breach of contract.

In their Second Cause of action, Plaintiffs claim relief under an implied warranty that the plant would be fit for the purpose for which it was purchased—i. e., breach of an implied warranty of fitness for a particular purpose, under the Uniform Commercial Code.

In their Third Cause of action, Plaintiffs allege more specifically a breach of the contract to construct; that is, I evaluate the Third Cause as an expansion of the First Cause.

In their Fourth Cause of action, Plaintiffs charge negligent construction and operation of the plant.

In their Fifth Cause of action, Plaintiffs allege breach of a warranty against liens and encumbrances.

Fred S. Carver, Inc., answered by denying both personal and subject matter jurisdiction; further, it interposed a general denial. By an amended answer, Fred S. Carver, Inc., offered a separate defense of estoppel, claimed to arise out of Plaintiff's failure to require of CGC that it furnish a performance bond as required under the construction contract, and by its acceptance of the benefits.

In its answer, CGC admitted execution of the construction contract and interposed a general denial to the allegations of warranty, breach and negligence.

CGC counterclaimed against OPCC, alleging in Claim I performance of the construction contract and nonpayment by OPCC. In Claim II CGC claimed operational and maintenance expenses of the plant from December, 1969, through May, 1970. In Claim III CGC demanded recovery of the rental payments advanced by it out of the payments from Change Order No. 7. In Claim IV is a demand for an accounting of the proceeds received in the insurance settlement resulting from the boiler explosion. Claim V is an allegation that CGC is entitled to indemnity from OPCC for any damages CGC may become liable for in a sepa-

rate action by Koppers on its contract with CGC.

CGC further counterclaimed against OPCC and the City of Omaha. In Claim VI CGC asserted that it declared the plant operational relying to its detriment on their (OPCC and the City of Omaha) representation that it would not be required to meet the August 1970 rental payment, and thereby suffered operational costs through the months of June, July and August of 1970, and that OPCC wrongfully declared CGC in default under the construction contract.

OPCC replied to the counterclaim by generally denying all allegations. Despite the entreaties of this Court, the City of Omaha did not—and has not to this date—replied to the counterclaim pleaded by CGC. See Rule 7(a), Federal Rules of Civil Procedure.

Notwithstanding this deficiency on the part of the City of Omaha, and having in mind the importance of deciding cases on their merits rather than on pleading technicalities, I overrule CGC's motion for default judgment against the City of Omaha. Though it would have been more prudent for Omaha's counsel to interpose a formal reply to CGC's counterclaim, I consider the evidence offered and received in support of the counterclaim allegations and the evidence offered and received as a defense thereto sufficient to overcome any pleading deficiency. In effect, I deem the pleadings to be amended to conform to the evidence, pursuant to Rule 15(b) of the Federal Rules of Civil Procedure.

I do find that this Court has jurisdiction of all parties and of the subject matter of the action and counterclaims.

The most active litigants, OPCC and CGC, have entered into a separate stipulation which reflects their analysis of the pleadings. By that stipulation:

If the Court finds liability on the complaint:

    A. Recovery on the First Cause bars recovery on the Second, Third and Fourth Causes.

    B. Recovery on the Second Cause bars recovery on the First, Third and Fourth Causes.

## THE LAW

This case can best be resolved by treating it as a sale of goods under the Nebraska Uniform Commercial Code (U.C.C.). (Revised Statutes of Nebraska, Volume 6, Uniform Commercial Code, Articles 1 and 2.) It is clear that courts are turning to the Uniform Commercial Code to resolve the problems of transactions of this type. *Aluminum Company of America v. Electro Flo Corp.,* 451 F.2d 1115 (10th Cir. 1971). *Sperry Rand Corporation v. Industrial Supply Corporation,* 337 F.2d 363 (5th Cir. 1964). Here, as in those cases, the buyer relied on the seller and the seller's expertise to examine a problem, recommend, design, and manufacture a product which, it was represented, would afford a solution.

In this case, Fred S. Carver, Inc., experts, made an investigation and recommended a solution. Then CGC, using those same experts, which it had taken over from Fred S. Carver, Inc., undertook to design, construct, and deliver a product, the processing plant, which would afford a solution, the production of marketable product from sewage.

Applying the Uniform Commercial Code to this situation, I find that the process plant was constructed subject to an implied warranty of merchantability as defined in U.C.C. § 2–314(2)(c); that is, a warranty that the processing plant was:

    "(c) . . . fit for the ordinary purposes for which such goods are used;."

I also find that the processing plant was constructed subject to an implied warranty of fitness for the particular purpose for which it was intended to be used. U.C.C. § 2–315:

    "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section

an implied warranty that the goods shall be fit for such purpose."

■ In this case, the particular purpose was to process the Omaha packinghouse wastes into a marketable product. I find that the seller knew the particular purpose for which the processing plant was required. I find the buyer relied on the seller's skill and judgment to furnish suitable goods. I also find that the implied warranty of merchantability and fitness for a particular purpose were not excluded under U.C.C. § 2–316. Exclusion, if it occurred, must have occurred under U.C.C. § 2–316(2):

". . . to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous."

The exclusionary language in the Amended Agreement is Section 16.1:

"This Amended Agreement supersedes any and all prior agreements or understandings between the parties hereto relating to the Project."

■ This language does not mention merchantability, and it is in no way more conspicuous than any other language of the contract. And by its terms it makes no implication of any limit to the requirement of the commercially operable plant which was contemplated by Section 1.4 of the Amended Agreement. Therefore, I find that OPCC is entitled to damages under the Damage stipulation in the amount of $3,361,482.85.

And, pursuant to that stipulation, I do not consider the First, Third, or Fourth Causes of Action since they are now moot as to CGC.

As to the Fifth Cause of Action:

■ While the Amended Agreement did not include a specific hold-harmless clause as to labor and materialmen liens, it did require in Section 1.2 that the contractor would furnish all tools, equipment, labor and materials, and perform all work in accordance with the plans and specifications. Section 4.1 of the Amended Agreement provided for the furnishing of a performance and laborer and materialmen's bond. For some reason, OPCC did not insist on this bond. While that may have amounted to a waiver of the requirement of bond, I do not interpret it as a waiver of the requirement that construction claims and liens be paid.

Again, we can turn to U.C.C. § 2–312(1)(a):

"(1) . . . there is in a contract for sale a warranty by seller that

(a) the title conveyed shall be good, and its transfer rightful;"

And under U.C.C. § 2–312(2):

"(2) A warranty . . . will be excluded or modified only by specific language . . . ."

The Amended Agreement contains no such specifically modified language. Therefore, I find CGC liable to OPCC on Count V, and assess damages pursuant to the damage stipulation in the amount of $1,685,442.00.

## CLAIM OF CITY OF OMAHA

In the course of development of this case I ruled that the City of Omaha was not entitled to claim relief as a third party beneficiary, and therefore granted Summary Judgment of Dismissal as to it. The Circuit Court discussed that order in *Omaha Pol. Con. Corp. v. Carver-Greenfield Corp.*, 516 F.2d 881 (8th Cir. 1975). At the time of trial, in an effort to comply with the spirit of that ruling, and to get a complete presentation of the case, I reversed myself, and reinstituted the City of Omaha. Upon requiring CGC and Fred S. Carver, Inc., to make known any problems of proof or need for delay which such reversal imposed on them, and upon their showing no need for additional delay, I directed the City of Omaha to complete its pleading and present its case. The issues of counterclaim were tried as on a general denial as to the City of Omaha, although it still has not completed its pleadings.

But returning to the claim of the City of Omaha, under the Amended Complaint I

find, after careful review of my previous order granting Summary Judgment of Dismissal as to the City of Omaha, and the language of the Eighth Circuit Court of Appeals in *Omaha Pol. Con. Corp. v. Carver-Greenfield Corp.,* supra, that I did err in my order granting the summary judgment.

I have found, under the Amended Engineering and Construction Contract, CGC impliedly warranted to OPCC that the process plant would handle the packinghouse waste problem and produce a marketable product. The question arises whether the City can claim any damages for CGC's breach of any of the express terms of the contract or for CGC's breach of the implied warranty. Since the City was not a party to the contract, in order for it to recover any damages for CGC's breach of that contract, it must do so as a third-party beneficiary. U.C.C. § 2–318 provides:

"*2–318 Third Party Beneficiaries of Warranties Express or Implied.*

A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this section."

CGC argues that, since the City is not a "natural person," § 2–318 precludes the City from having any third-party beneficiary claims under the contract. However, Official Comment 3 [4] to this section recites:

3. The first alternative expressly includes as beneficiaries within its provisions the family, household, and guests of the purchaser. Beyond this, the section is neutral and is not intended to enlarge or restrict the developing case law on whether the seller's warranties, *given to his buyer who resells, extend to other persons in the distributive chain.* [Emphasis added.]

Anderson, in his treatise on the U.C.C., makes these comments on § 2–318:

§ 2–318:6. Effect upon requirement of privity contract.

UCC § 2–318 is not a general regulation of the subject of privity.

In those jurisdictions in which privity of contract had been retained as a limitation upon warranty liability, the effect of UCC § 2–318 is to abolish that rule to the extent specified by that section and to permit the persons named in that section to bring suit for breach of warranty although not in privity with the person sued. In jurisdictions in which the concept of privity had been abandoned, adherence to the scope of UCC § 2–318 would constitute a contraction of the prior law as where under that law it was held that a warranty ran to "all persons for whom . . . [the product] is intended."

The fact that a given plaintiff is not expressly authorized to sue for breach of warranty by UCC § 2–318 does not prevent the court from holding that as a matter of case or special statutory law the particular plaintiff is not barred by the privity rule. The fact that the Code has taken a neutral position with respect to the question of privity except as expressly affected by UCC § 2–318 is not to be regarded as showing any legislative policy to limit the cases in which privity is not required to those which come within the scope of that section. That is, UCC § 2–318 is to be interpreted only as authorizing certain persons to sue and there is no negative implication by which the section prohibits suit by any persons who is not described in that section. Otherwise stated, the expansion of "horizontal" privity by UCC § 2–318 was not intended to set any limits in terms of "vertical" privity.

Nebraska Supreme Court cited a Comment to the Code in deciding an issue in *Hawkins Construction Company v. Matthews Co., Inc.,* 190 Neb. 546, 209 N.W.2d 643, 655 (1973).

---

**4.** "Official Comments to the Uniform Commercial Code are not binding upon the courts but they are persuasive in the matters of interpretation . . . ." *Thompson v. U. S.,* 408 F.2d 1075, 1084 n. 15 (8th Cir. 1969). And the

Whether privity of contract is required under the Code in cases not expressly covered by § 2–318 is to be determined by the court.

■ Consequently, as Comment 3 to § 2–318 and Anderson make clear, § 2–318 was not intended to set any limits in terms of "vertical" privity, but only in terms of "horizontal" privity. It leaves the area of "vertical" privity open to expanding case law.

It might be helpful to distinguish between "horizontal" and "vertical" privity. By "vertical" privity is meant privity which includes all parties up the distributive chain from the immediate seller. For example, in a typical commercial situation, a purchasing consumer would be in vertical privity with the retailer, the wholesaler, and the manufacturer. By "horizontal" privity is meant privity which includes the buyer of the product together with any person who uses the product. For example, a purchasing consumer would be in horizontal privity with any family member or household guest who used the purchased product.

■ I find that by reason of *Hawkins Construction Co. v. Matthews Co., Inc.*, supra, note 4, the Nebraska Supreme Court has judicially expanded § 2–318 "vertically" to include the City as a proper third-party beneficiary in this case.

In *Hawkins* the plaintiff, a construction company ("lessee"), leased certain scaffolding equipment from the defendant Matthews, Co., Inc. ("lessor"). The lessor had purchased the scaffolding from defendant Waco Scaffold and Shoring Company ("manufacturer"). The lessor had given the lessee one of the manufacturer's advertising brochures. The brochure had been rubber-stamped with one of the lessor's trade names, and it made various representations as to the load-handling capabilities of the scaffolding equipment.

The scaffolding equipment collapsed on the lessee's construction site. The lessee sued both the lessor and the manufacturer for the cost of replacing the damaged structure. No claims for personal injury were involved.

The Nebraska Supreme Court held that the warranty provisions of the U.C.C. controlled, rather than the doctrine of strict tort liability. Citing U.C.C. § 2–313, the court found that the representations in the advertising brochure constituted express warranties as a matter of law. It felt that the evidence showed an adoption of the manufacturer's warranty by the lessor as a matter of law. But—more importantly—the court found that the express warranties in the brochure gave rise to a cause of action by the lessee against the manufacturer! In doing so, the court said:

"A manufacturer or seller may be held liable under such an advertising warranty even though he is not in privity of contract with the purchaser."

Though the Nebraska Supreme Court did not say so, it was judicially expanding § 2–318 "vertically" as the Official Comments under that section permit. Perhaps the court felt no need to refer specifically to § 2–318 because the Official Comments under § 2–313, which the Court was discussing, contained the following:

2. Although this section is limited in its scope and direct purpose to warranties made by the seller to the buyer as part of a contract for sale, the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined . . . to the direct parties to such a contract.

The provisions of section 2–318 on third party beneficiaries expressly recognize this case law development within one particular area. Beyond that, the matter is left to the case law with the intention that the policies of this Act may offer useful guidance in dealing with further cases as they arise.

The lessee was not the "buyer" of the manufacturer. (The lessor was.) The lessee was not a "natural person"—but was a construction company. The lessee was not a member of the family or household of the buyer, nor a guest in the home of the buyer. Nor was the lessee injured "in person." Yet the express warranty found in the ad-

vertising brochure—in a sale between the manufacturer and the lessor—was found to inure to the benefit of the lessee. Obviously, the court, analogizing a lease to a sale, found the lessee to be in vertical privity with the lessor, and judicially expanded § 2–318 vertically to give the lessee a third-party beneficiary claim against the manufacturer. See *Midland Forge, Inc. v. Letts Industries, Inc.*, 395 F.Supp. 506, 510–11 (N.D.Ia.1975).

## DAMAGES OF CITY OF OMAHA

A special Master took the evidence of damages proffered by the City of Omaha.

■ Omaha's exhibits 1, 2, 3 and 6 at the Master's hearing outline the Accounting Department's coding system for accounts. But a review of them shows that there is no breakdown which will allow me to identify the amounts which the City paid solely to operate the process plant. I find these costs are not compensable. Nor do the records identify the costs the City incurred for preservation of the shut-down plant or for developments or improvements outside the scope of the original concept. I also find these costs are not compensable. For example, examination of the plant showed that it is now used for warehousing. Also the plant's machinery is being pirated for use outside the plant. And the plant has been redesigned for limited use with the basins. Finally, I cannot tell from the stipulation for damages, or from the evidence presented to the Master, whether damages are being duplicated.

■ The Plaintiff, City of Omaha, did accept the processing plant on August 15, 1970, when it denied access to CGC personnel, thus doing an act inconsistent with the seller's ownership. U.C.C. § 2–606(c).

At that time it became limited to the remedies provided in U.C.C. § 2–607. I find that this acceptance obligated OPCC and the City of Omaha to pay the contract rate for the principal contract plus change orders 1 through 7, but reduced by any damages allotted to the buyers. (U.C.C. § 2–607(1)). I also find that in the period, par-

ticularly from the 15th of March, 1970 through the 15th of August, 1970, OPCC notified the seller of the fact of seller's breach of the contract (this in accordance with U.C.C. § 2–607(3)(a)). This puts the City of Omaha over to U.C.C. § 2–714 and § 2–715 for standards of damage. I find that the stipulation between OPCC and CGC effects a reasonable determination of the damages covered by that stipulation pursuant to U.C.C. § 2–714(1) and (2). This decision is made in part because, in the proceedings before the Master, the damage evidence was not marshalled so that I can apply the standards of § 2–714(1) and (2) to it.

I also find that the evidence was not marshalled so that I can apply the standard of U.C.C. § 2–715(1) to it. Therefore, I find the amount of incidental damages has not been proved.

Mr. Charles A. Geisler, City Sanitation Engineer for the City of Omaha, attempted to estimate the distribution of expenditures between the processing plant and the basin area. But his estimates were not firm enough so that I could conclude that a given estimate was more likely so than not so. (See testimony of Geisler before Master p. 102 and 176.)

■ As to the consequential damages provided for in U.C.C. § 2–715(2)(a), I find that the cost of hauling and disposing of the fats and solids from the delivery point at the basins, during the period August 15, 1970 to the present is such a consequential damage.

A load-out building was built for $14,000 in 1972. Transcript before Master, p. 103.

Process operators attempted to operate the plant until about 1971. At that point all attempts to operate the plant apparently ended. Transcript before Master, p. 135. And it does appear that the land fill operation for the process plant material was separated from general land fill operations. Transcript before Master, p. 147.

In its claim of damages the City seeks to recover payments for lost anticipated income.

I agree that future income loss is an element of consequential damages. I find consistently with the majority of holdings, that loss of future income is held to a high standard of proof. So high in fact that loss of future income can rarely be established beyond the level of speculation. So, here, I find that the proof of loss of future income is too speculative to allow the granting of damages thereon.

To reach my conclusions as to damages, I have relied principally on the transcript before the Master, three volumes, on exhibits 3 and 6, and on the Report of Master, filed March 15, 1976. The rules I apply in analyzing this evidence and reaching my decision are:

1. The percentages of place of expense are those testified to by Mr. Geisler, first on direct, then on cross examination and are inconclusive.

2. Costs of operation of the plant reflect the fact that the boiler area and some of the other units have been worked into the operation of the basin area.

3. Except for clearly identified land fill and trucking expenses, maintenance and storage costs of the plant are not chargeable to CGC. Also, taxes, utilities, and such costs are not chargeable to CGC.

Finally, Plaintiffs have given testimony as to landfill damages through 1975. They have given no evidence as to future damages.

| | | | |
|---|---|---|---|
| A. | 1970 | I find no evidence of landfill costs. Costs logged are attributable to preservation of the plant and repair after injury and act of God. | |
| B. | 1971 | All landfill costs | $258,212.08 |
| C. | 1972 | All landfill costs | 140,373.36 |
| D. | 1973 | All landfill costs | 30,357.91 |
| E. | 1974 | All landfill costs | 25,565.10 |
| F. | 1975 | All landfill costs | 28,461.97 |
| | | TOTAL | $482,970.42 |

This reasoning disregards the basin area vouchers objected to, and includes the cost of the load out building and the all-weather landfill road.

## COUNTERCLAIMS

Turning now to rulings on CGC's counterclaim;

Again I find that the damage stipulation is binding between OPCC and CGC under U.C.C. § 2–719. And again, I find that the City of Omaha has furnished no better evidence of the amounts involved.

A. Claim I of the Damage Stipulation:

1. Amounts not paid to CGC for work pursuant to various change orders under the contract.    $ 29,248.93

2. I find that CGC has wholly failed to prove that CGC was entitled to recover the expenses encompassed in Claim I–2.

3. I find that CGC has wholly failed to prove that CGC was entitled to recover the expenses encompassed in Claim I–3.

B. Claim II of the Damage Stipulation:

I find that CGC is not entitled to compensation for cost of start-up efforts.

C. Amount of initial lease purchase payment:

I find that this payment amounted to an advance by CGC to OPCC to assist it to meet its rental payments, and is chargeable against OPCC.    $128,500.00

D. Claim IV—Amount of insurance loss proceeds.

I find that CGC, not having delivered the plant at the time of the loss, was entitled to recover the balance of that loss payment.    $ 19,066.00

I find that OPCC is not liable for any expenses incurred by CGOmaha, since CGOmaha never did commence performance under its operating agreement with OPCC.

I find that neither party is entitled to attorneys fees. I also find that the prevailing Plaintiffs are entitled to costs. Further, I approve the accounting of the Special Master and direct that there be included in costs the following items to Special Master David J. Lamphier:

| | |
|---|---|
| 50.1 hours at $35.00 | $1,753.50 |
| Costs | |
| Court Reporter | 729.87 |
| Xerox | 100.00 |
| Quick Print | 14.08 |
| TOTAL | $2,597.45 |

## LIABILITY OF FRED S. CARVER, INC.

The only problem remaining is whether Fred S. Carver, Inc., is liable with CGC on the theory either that CGC was an agent and Fred S. Carver, Inc., was a disclosed principal; or that CGC was a creature of Fred S. Carver, Inc., and the corporate veil of CGC may be pierced so that CGC's liability becomes that of Fred S. Carver, Inc.

■ I find that the simple agency relation did not exist. The evidence shows that CGC and Fred S. Carver, Inc., were going their separate ways. There was no evidence that Fred S. Carver, Inc., controlled CGC in its management of the Omaha job. It is true that the accounting personnel of Fred S. Carver, Inc., and the housing of Fred S. Carver, Inc., were loaned to CGC, but this was clearly done on the basis of advances and repayments, as the bookkeeping records show.

The evidence did show that there had been a schism between the Carver brothers, who had been the principal stockholders of Fred S. Carver, Inc., and the dominant figures in CGC, Greenfield and Haselton. And as pointed out earlier, the Carver brothers had traded down their interest in CGC so that they could reacquire control of Fred S. Carver, Inc., and then had sold Fred S. Carver, Inc. This was all completed by November 25, 1969.

■ In his Memorandum and Order filed in this case on December 15, 1972, Senior Judge Robinson, in denying a motion for summary judgment by Fred S. Carver, Inc., outlined the principles which control the application of the doctrine of disregard of corporate entities. His dissertation is so apt that I adopt it and apply it to the facts as proved in this case. Judge Robinson said:

"The Court agrees with the sound principles advanced by Circuit Judge Johnsen in *Goldberg v. Tri-States Theater Corporation,* 126 F.2d 26 [8th Cir. 1942] that there must be sound basis to ignore the separate corporate entities."

and;

"It is the plaintiffs contention that there is a proper basis in this action which could justify the application of the 'instrumentality theory'. The briefs of the parties discuss some of the other nomenclature sometimes used:

'piercing the corporate veil,' 'alter ego' and business conduit."

Both sides cite *Lowendahl v. Baltimore & Ohio Railroad Company,* 247 App.Div. 144, 287 N.Y.S. 62 [1963] which is described in 38 A.L.R.3rd at 1121, § 8, as "a leading case in expounding the instrumentality rule." This case is cited in *National Bond Finance Co. v. General Motors Corp.,* 238 F.Supp. 248 [W.D.Mo. 1964] and the following is quoted from *Lowendahl* as one of the clearest statements in this area of the law:

"Restating the instrumentality rule, we may say that in any case, except express agency, estoppel, or direct tort, three elements must be proved:

'[1] Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

'[2] Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and

'[3] The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.' "

and;

"As stated generally in *National Bond Finance Co.,* 238 F.Supp. at 255 the 'instrumentality' or 'alter ego' doctrine consists of broad principles:

"[When] a corporation is so dominated by another corporation, that the subservient corporation becomes a mere instrument, and is really indistinct from the controlling corporation, then the corporate veil of the dominated corporation will be disregarded, if to retain its results in injustice."

Each case should be decided upon its own facts and there are a number of factors to be considered in the totality of the circumstances including, but not limited to such factors as: the ownership of stock of C–G by FSC, the nature and extent of common officers and directors, the plaintiffs' knowledge of the relationship between C–G and FSC, capitalization and financing."

And for a general discussion of these principles see W. Fletcher, Cyclopedia of the Law of Private Corporations, § 43 at 209 (perm. ed. rev. repl. 1974).

■ Applying these principles to the facts developed before me, I find that the stock control of Fred S. Carver, Inc., remained at all times in the Carver brothers. I further find that the actual operative control of CGC was held by Charles Greenfield and Philip Haselton, and after the tradeout, stock control of CGC was no longer in the Carver brothers.

I find that while the financial record keeping was dominated by Fred S. Carver, Inc., until Carver-Greenfield moved to new quarters in November, 1968, still the finances were actually dominated by CGC. And, finally, the evidence establishes that CGC personnel, not Fred S. Carver, Inc., personnel, controlled the Omaha transactions.

Since the second and third principles are not applicable unless the first is established, I need go no further to determine that this is not a situation which justifies "piercing the corporate veil."

Therefore, the action as to Fred S. Carver, Inc., must be dismissed on its merits.

SUMMARY

TO SUMMARIZE THE DAMAGES:

To the City of Omaha and OPCC jointly:

| | | |
|---|---|---|
| 1. Damages under Count II | | $3,361,482.85 |
| 2. Damages under Count V | | 1,685,442.00 |
| TOTAL | | $5,046,924.85 |

That against those damages, CGC is entitled to credits of:

| | | |
|---|---|---|
| Claim I | $ 29,248.93 | |
| Amount of initial lease purchase payment | | 128,500.00 |
| Claim IV | 19,066.00 | $176,814.93 |

Making a net judgment against CGC and in favor of the City of Omaha and OPCC ........................... $4,870,109.92

In addition, the City of Omaha is entitled to judgment against CGC in the amount of ................... $482,970.42

Costs of Special Master ............. $2,597.45

The Defendant, Carver-Greenfield Corporation, shall remit to the Special Master his costs forthwith.

This Memorandum and order is drawn in conformance with the requirements of Rule 52(a), Federal Rules of civil procedure.

Counsel for the Plaintiffs will promptly prepare and submit appropriate form of judgment in conformity herewith.